654 A.2d 1062

COMMONWEALTH of Pennsylvania, Appellant,

v.

Wilfredo SANTIAGO, Appellee.

Superior Court of Pennsylvania.

Argued Jan. 19, 1994.

Filed Dec. 7, 1994.

Reargument Denied Feb. 2, 1995.

450

Ronald Eisenberg, Deputy Dist. Atty., Philadelphia, for Com., appellant.

David Rudovsky, Philadelphia, for appellee.

Before WIEAND, HUDOCK and SAYLOR, JJ.

WIEAND, Judge.

This is an appeal by the Commonwealth from an order of the trial court which barred a retrial of Wilfredo Santiago and dismissed charges of murder against him because of the prosecution's failure to make timely disclosure to the defense of certain information alleged to be material and exculpatory. The Commonwealth argues that the information not disclosed was neither material to the defense nor exculpatory and that, in any event, dismissal of the charges was not required by due process or by the double jeopardy clauses of the federal or state constitutions. After careful and tedious review, we agree that the trial court was in error when it barred a retrial

and dismissed the charges. Therefore, we reverse and remand for further proceedings.

## I. Factual and Procedural History of the Case

On May 28, 1985, at or about 3:00 a.m., the body of Police Officer Thomas Trench was found in his patrol car at the corner of 17th and Spring Garden Streets in Philadelphia. He had been shot in the face and in the left side of the neck at close range. An intensive investigation was begun by the Philadelphia Police Department to apprehend his murderer. During the early hours of this investigation, it was learned that Wilfredo Santiago had participated in a neighborhood altercation on the evening prior to the murder, during which he had been observed by civilian and police witnesses to be in possession of a handgun. When police had attempted to intervene in the dispute, Santiago had fled and had been pursued by police to the home of his aunt, Carmen Geigel, where he was residing at the time. An altercation had ensued between police and members of Santiago's family in which Santiago's aunt and his cousin, Manuel Roldan, had attempted to prevent police from arresting Santiago. Both Santiago and Roldan had been taken into police custody, but Santiago had been released after giving police an alias which had prevented their learning that he had been on parole at the time. Upon being released from police custody, Santiago had made threats against Police Officer Ismael Cruz, whom Santiago believed had used excessive force against him and his family. Officer Cruz had been assigned to the same patrol car, number 912, in which Officer Trench was later found murdered.

On the afternoon following the murder of Officer Trench, Santiago was re-arrested and charged in connection with the altercation in which he had been involved on the prior evening. Pursuant to a request by the District Attorney's Office, bail was set at $75,000. Unable to make bail, Santiago remained incarcerated, and, on several occasions, was questioned by police regarding possible involvement in the murder of Officer Trench. During each interrogation, Santiago gave an exculpatory statement in which he denied any involvement in the

killing. However, on June 27, 1985, while being questioned by police, Santiago admitted to having had a .38 caliber revolver, the same type of gun which had been used in the shooting of Officer Trench. Santiago claimed, however, that he had sold the gun two weeks before the Trench shooting. On July 23, 1985, Santiago was charged in connection with the murder of Officer Trench.

On August 1, 1985, the Commonwealth sought and obtained a protective order which prevented the defense from examining the affidavit of probable cause for the warrant to arrest Santiago for murder. The court also ordered that the affidavit be sealed until further court order. This order remained in effect until April 21, 1986, when the trial court lifted the protective order and directed the Commonwealth to make appropriate discovery information available to the defense. Thereafter, a suppression hearing was held from April 23, 1986 until June 6, 1986, following which the trial court refused to suppress statements made by Santiago to police and to prison inmates. Also not suppressed were physical evidence seized by police and certain intercepted wire communications. The trial court, however, did order that intercepted communications between Santiago's aunt and her husband be suppressed.

Following jury selection, trial commenced on July 14, 1986. The Commonwealth presented evidence of Santiago's involvement in the earlier neighborhood altercation and his threats to police on the evening prior to Officer Trench's murder. Evidence was also introduced that Santiago had been seen riding a bicycle near the scene of the shooting within an hour of the crime. One witness, Jose Rosario, testified that Santiago, while riding his bicycle prior to the shooting, had dropped a handgun which he had been carrying concealed in a newspaper and had to stop to retrieve it. Santiago also had been observed, approximately ten minutes after the shooting, riding north on 17th Street, away from the murder scene. Evidence was also presented that Santiago had been observed with a .38 caliber handgun during the weeks preceding the murder of Officer Trench. Finally, there was evidence that Santiago had

456

made statements to two inmates in which he had admitted killing Officer Trench, and that he had told a third inmate that he was not worried about the police finding the gun.

Much of the Commonwealth's evidence at trial, however, was presented in the form of prior inconsistent statements by its witnesses. These statements were introduced as substantive evidence pursuant to *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986).[1] This was necessary because several key Commonwealth witnesses, prior to trial, recanted or denied having made statements to police which identified Santiago as having been near the scene of the crime shortly before and after the shooting of Officer Trench. The defense argued in summation that the witnesses' prior statements to police had resulted from coercive tactics employed in the investigation of Officer Trench's murder.[2] The defense also impeached the testimony of other Commonwealth witnesses by introducing prior inconsistent statements which the witnesses had

1. In *Commonwealth v. Brady, supra,* the Pennsylvania Supreme Court held "that otherwise admissible prior inconsistent statements of a declarant who is a witness in a judicial proceeding and is available for cross-examination may be used as substantive evidence to prove the truth of the matters asserted therein." *Id.* at 131, 507 A.2d at 70.

2. A civil rights lawsuit had been filed in federal court by a Spring Garden community group and resulted in the issuance of a preliminary injunction enjoining the Philadelphia Police Department from continuing to violate the constitutional rights of neighborhood residents in its efforts to identify the murderer of Officer Trench. The tactics employed by police in the early stages of the investigation were described in the opinion of the Honorable Clarence Newcomer in the following manner:

> The unrebutted evidence demonstrated a repeated, persistent pattern of unconstitutional stops, detentions, seizures and frisks, leading me to the inescapable conclusion that the police were conducting a "sweep" in their overzealous efforts to determine who had killed Officer Trench. These "sweeps" are documented for a one-week period, May 28, 1985 through June 5, 1985. Each witness who testified that he was subjected to the "sweep" encountered the same basic scenario. He was sitting or walking in the Spring Garden neighborhood when, without provocation or explanation, the police would handcuff him, frisk him, and take him away in a van or paddywagon to the Ninth District Precinct. There the subject would be kept from approximately two to ten hours, before being ultimately released.

*Spring Garden United Neighbors, Inc. v. City of Philadelphia,* 614 F.Supp. 1350, 1351 (E.D.Pa.1985).

made. The defense further emphasized to the jury, during summation, that, on each occasion on which he had been questioned by police, Santiago consistently had asserted that he was at home at the time of the murder. On August 5, 1986, after hearing all of the evidence, the jury found Santiago guilty of first degree murder and possession of an instrument of crime. On the following day, the penalty phase of the trial commenced, and the jury fixed Santiago's sentence for first degree murder at life imprisonment.

On August 7, 1986, Santiago filed post-trial motions for new trial and/or in arrest of judgment. Supplemental and amended post-trial motions were also filed on Santiago's behalf. An en banc panel of the Philadelphia Court of Common Pleas was convened on October 19, 1987 to hear argument on Santiago's post-trial motions, but, on June 23, 1988, post-trial relief was denied. Santiago was then formally sentenced to life imprisonment for first degree murder and to serve a concurrent term of imprisonment for not less than two and one-half (2½) years nor more than five (5) years for possession of an instrument of crime. An appeal was thereafter filed in the Superior Court, and that Court, following argument before a court en banc, reversed the judgment of sentence and granted a new trial on grounds that: (1) police had violated Santiago's Fifth Amendment right to counsel by continuing to question him after he had requested counsel, even though counsel had been appointed to represent him; and (2) the trial court had violated Santiago's due process rights by failing to disclose to the defense exculpatory evidence which the court had obtained during an in camera interview with a key Commonwealth witness prior to trial, which interview had been held without the presence of defense counsel or the prosecutor. See: *Commonwealth v. Santiago*, 405 Pa.Super. 56, 591 A.2d 1095 (1991) (en banc). A petition for allocatur was denied by the Pennsylvania Supreme Court on December 17, 1991. See: *Commonwealth v. Santiago*, 529 Pa. 633, 600 A.2d 953 (1991).

Upon remand to the trial court, Santiago, on March 17, 1992, filed a motion for pre-trial discovery in which, inter alia, he requested "[a]ny evidence favorable to the Defendant which

is material to the issue of guilt or punishment, or which bears upon or could reasonably weaken or affect the credibility of any evidence proposed to be introduced against the Defendant by the Commonwealth, or which bears in any material degree on the charges against the Defendant." In its reply, the Commonwealth responded that such information had "already [been] exhaustively provided." Thereafter, several hearings were held upon Santiago's discovery requests, during which the Commonwealth was ordered to disclose the daily police activity reports pertaining to the investigation of Officer Trench's murder. Ultimately, the Commonwealth was ordered also to disclose to the defense all statements of persons interviewed by police in connection with the murder of Officer Trench. On July 13, 1992, after receiving statements from the Commonwealth which had not been disclosed prior to his initial trial, Santiago filed a motion to dismiss all charges on grounds that his constitutional right to due process and principles of double jeopardy had been violated by the Commonwealth's intentional and deliberate withholding of material, exculpatory evidence. Specifically, Santiago alleged that the Commonwealth had withheld nineteen items of evidence which would have been admissible to: (1) demonstrate that there were other possible perpetrators of the crime; (2) impeach the testimony of key prosecution witnesses; and (3) undermine essential aspects of the Commonwealth's theory of the case.

A hearing was held on Santiago's motion to dismiss on September 29, 1992; and, on October 15, 1992, in a ruling issued from the bench, the trial court granted Santiago's motion and ordered that he be discharged. The court based its order primarily upon the prosecutor's failure to disclose to the defense the statement of Jeffrey Beard, who had initially claimed to be an eyewitness to the shooting and had described the perpetrator as someone other than Santiago. Subsequently, however, Beard had admitted to police that he had lied and had not actually witnessed Officer Trench's murder. The trial court also based its ruling on a second category of evidence which had not been disclosed to the defense prior to Santiago's trial, i.e., statements of persons who had not actually wit-

nessed the shooting, but who, the court found, had seen and heard things inconsistent with the Commonwealth's theory of the case. The Commonwealth appealed.

## II. The Duty of the Prosecution to Disclose Evidence

■ In the landmark decision of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–1197, 10 L.Ed.2d at 218. Subsequently, in *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court extended its holding in *Brady v. Maryland, supra,* to include evidence which bears materially upon the credibility of a key prosecution witness. The Court observed that "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." *Id.* at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108, quoting *Napue v. Illinois,* 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217, 1221 (1959).

■ " '*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation.' " *United States v. Krauth,* 769 F.2d 473, 476 (8th Cir.1985), quoting *United States v. Beasley,* 576 F.2d 626, 630 (5th Cir.1978), *cert. denied,* 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979). See also: *United States v. LaRouche,* 896 F.2d 815, 826 (4th Cir.1990), *cert. denied,* 496 U.S. 927, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990); *United States v. Bonnett,* 877 F.2d 1450, 1459 (10th Cir.1989). In this regard, the Supreme Court has observed that "[t]here is no general constitutional right to discovery in a criminal case, and *Brady* did not create one; ... 'the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded....' " *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30, 42 (1977), quoting *Wardius v. Oregon,* 412 U.S. 470, 474, 93 S.Ct. 2208, 2212, 37 L.Ed.2d 82, 87 (1973). See

also: *Commonwealth v. Chambers,* 528 Pa. 558, 572–573, 599 A.2d 630, 637 (1991), *cert. denied,* 504 U.S. 946, 112 S.Ct. 2290, 119 L.Ed.2d 214 (1992); *Commonwealth v. Murphy,* 493 Pa. 35, 45, 425 A.2d 352, 357 (1981). Thus, " '[t]he rationale underlying *Brady* is not to supply a defendant with all the evidence in the Government's possession which might conceivably assist the preparation of his defense, but to assure that the defendant will not be denied access to exculpatory evidence *only* known to the Government.' " *Tate v. Wood,* 963 F.2d 20, 25 (2d Cir.1992), quoting *United States v. LeRoy,* 687 F.2d 610, 619 (2d Cir.1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

■ The law is clear, therefore, that a "prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley,* 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 489–490 (1985) (footnote omitted). See also: *United States v. Pou,* 953 F.2d 363, 366 (8th Cir.1992), *cert. denied,* 504 U.S. 926 and 112 S.Ct. 1982 and 1983, 118 L.Ed.2d 580 and 581 (1992); *Walker v. Lockhart,* 763 F.2d 942, 957 (8th Cir.1985) (en banc), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3332, 92 L.Ed.2d 738 (1986); *United States v. Davis,* 752 F.2d 963, 976 (5th Cir.1985); *United States v. Higgs,* 713 F.2d 39, 42 (3d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984). Moreover, the Supreme Court has observed:

A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files. See *United States v. Bagley, supra,* 473 U.S., at 675, 105 S.Ct., at 3380; *United States v. Agurs, supra,* 427 U.S. at 111, 96 S.Ct. at 2401. Although the eye of an advocate may be helpful to a defendant in ferreting out information, *Dennis v. United States,* 384 U.S. 855, 875, 86 S.Ct. 1840, 1851, 16 L.Ed.2d 973 (1966), this Court has never held—even in the absence of a statute restricting disclosure—that a defendant alone may make the determination as to the materiality of the information. Set-

tled practice is to the contrary. In the typical case where a defendant makes only a general request for exculpatory material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance. See *Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 846, 51 L.Ed.2d 30 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one").

*Pennsylvania v. Ritchie,* 480 U.S. 39, 59–60, 107 S.Ct. 989, 1002, 94 L.Ed.2d 40, 58–59 (1987) (footnote omitted). See also: *United States v. Burger,* 773 F.Supp. 1419, 1426–1427 (D.Kan.1991).

"To establish a *Brady* violation a defendant must show (1) that the prosecution suppressed evidence, (2) that the evidence suppressed was favorable to the defendant or exculpatory, and (3) that the evidence suppressed was material to the issues at trial." *United States v. Burroughs,* 830 F.2d 1574, 1577–1578 (11th Cir.1987), *cert. denied,* 485 U.S. 969, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988). See also: *United States v. Young,* 20 F.3d 758, 764 (7th Cir.1994); *Prewitt v. Goeke,* 978 F.2d 1073, 1078 (8th Cir.1992); *May v. Collins,* 955 F.2d 299, 315 (5th Cir.1992), *cert. denied,* 504 U.S. 901, 112 S.Ct. 1925, 118 L.Ed.2d 533 (1992); *Stano v. Dugger,* 901 F.2d 898, 899 (11th Cir.1990) (en banc); *Elmore v. Foltz,* 768 F.2d 773, 777 (6th Cir.1985). " '[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Pennsylvania v. Ritchie, supra,* 480 U.S. at 57, 107 S.Ct. at 1001, 94 L.Ed.2d at 57, quoting *United States v. Bagley, supra,* 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494 (Opinion by Blackmun, J. Announcing the Judgment of the Court). See also: *United*

States v. Bagley, supra, 473 U.S. at 685, 105 S.Ct. at 3385, 87 L.Ed.2d at 496 (Concurring Opinion by White, J.); *Ballinger v. Kerby,* 3 F.3d 1371, 1376 (10th Cir.1993); *United States v. LaFuente,* 991 F.2d 1406, 1410 (8th Cir.1993); *Miller v. Angliker,* 848 F.2d 1312, 1320 (2d Cir.1988), *cert. denied,* 488 U.S. 890, 109 S.Ct. 224, 102 L.Ed.2d 214 (1988). " '[A] rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments.' " *United States v. Abello–Silva,* 948 F.2d 1168, 1179 (10th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992), quoting *United States v. Bagley, supra,* 473 U.S. at 676 n. 7, 105 S.Ct. at 3380 n. 7, 87 L.Ed.2d at 489 n. 7.

In determining the materiality of evidence withheld by the prosecution under *Brady v. Maryland, supra,* an appellate court must "view the suppressed evidence's significance in relation to the record as a whole." *United States v. Thornbrugh,* 962 F.2d 1438, 1444 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 220, 121 L.Ed.2d 158 (1992), *vacated on other grounds,* —— U.S. ——, 113 S.Ct. 2405, 124 L.Ed.2d 630 (1993). See also: *Brown v. Borg,* 951 F.2d 1011, 1016–1017 (9th Cir.1991); *United States ex rel. Marzeno v. Gengler,* 574 F.2d 730, 736 (3d Cir.1978). Thus,

> we must avoid concentrating on the suppressed evidence in isolation. Rather, we must place it in the context of the entire record. Evidence that may first appear to be quite compelling when considered alone can lose its potency when weighed and measured with all the other evidence, both inculpatory and exculpatory. Implicit in the standard of materiality is the notion that the significance of any particular bit of evidence can only be determined by comparison to the rest.

*Trujillo v. Sullivan,* 815 F.2d 597, 613 (10th Cir.1987), *cert. denied,* 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987). "On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United*

*States v. Agurs,* 427 U.S. 97, 113, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342, 355 (1976). When multiple nondisclosures are alleged, moreover, "the effect of each nondisclosure must not only be considered alone, for the cumulative effect of the nondisclosures might require reversal even though, standing alone, each bit of omitted evidence may not be sufficiently 'material' to justify a new trial." *United States ex rel. Marzeno v. Gengler, supra,* 574 F.2d at 736–737. See also: *United States v. Stifel,* 594 F.Supp. 1525, 1540 (N.D.Ohio 1984). Accordingly, application of the test for materiality

> requires an analysis of the evidence adduced at trial and of the probable impact of the undisclosed information. In this context we cannot merely consider the evidence in the light most favorable to the government but must instead evaluate all the evidence as it would bear on the deliberations of a factfinder.

*Cannon v. State of Alabama,* 558 F.2d 1211, 1214 (5th Cir. 1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978).

■ "When the State possesses information that might well exonerate a defendant in a criminal case, it has an affirmative duty to disclose that information. While frivolous information and useless leads can be ignored, if evidence is clearly relevant and helpful to the defense, it must be disclosed." *Moore v. Illinois,* 408 U.S. 786, 809, 92 S.Ct. 2562, 2575, 33 L.Ed.2d 706, 721 (1972) (Concurring and Dissenting Opinion by Marshall, J.). As such, "*Brady* requires the prosecution to produce evidence that someone else may have committed the crime." *Jarrell v. Balkcom,* 735 F.2d 1242, 1258 (11th Cir.1984), *cert. denied,* 471 U.S. 1103, 105 S.Ct. 2331, 85 L.Ed.2d 848 (1985). See, e.g.: *Bowen v. Maynard,* 799 F.2d 593, 610–613 (10th Cir.1986), *cert. denied,* 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986) (prosecutor withheld evidence that someone who resembled the defendant had motive, opportunity and ability to commit the crime); *Cannon v. State of Alabama, supra,* 558 F.2d at 1213–1216 (prosecutor failed to disclose existence of eyewitness who positively identified someone other than the defendant). Cf. *Commonwealth v. Rivers,* 537 Pa. 394, 405,

644 A.2d 710, 715 (1994) ("[E]vidence that someone other than the defendant may have committed the crime is always admissible."); *Commonwealth v. Novasak*, 414 Pa.Super. 21, 33, 606 A.2d 477, 483 (1992) (same).

At least one federal court has held that a prosecutor was required under *Brady v. Maryland, supra*, 373 U.S. at 83, 83 S.Ct. 1194, to disclose to the defense those statements made by an eyewitness which made no reference to the defendant's presence or participation in the crime, upon the theory that such statements "must be viewed as a potentially powerful exculpation." *Jones v. Jago*, 575 F.2d 1164, 1168 (6th Cir. 1978), *cert. denied*, 439 U.S. 883, 99 S.Ct. 223, 58 L.Ed.2d 196 (1978). *Brady v. Maryland* has also been interpreted as requiring the prosecution "to turn over to the defense in discovery *all* material information casting a shadow on a government witness's credibility." *United States v. Bernal–Obeso*, 989 F.2d 331, 334 (9th Cir.1993).

The United States Supreme Court has made clear, however, that "there is 'no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case.' The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs, supra*, 427 U.S. at 109–110, 96 S.Ct. at 2400, 49 L.Ed.2d at 353, quoting *Moore v. Illinois, supra*, 408 U.S. at 795, 92 S.Ct. at 2568, 33 L.Ed.2d at 713. Thus, *Brady v. Maryland* does not require the production of information "which is merely 'not inculpatory' and might therefore form the groundwork for some argument for the defendant." *United States v. Kennedy*, 819 F.Supp. 1510, 1519 (D.Colo.1993), *affirmed*, 994 F.2d 747 (10th Cir.1993). See also: *United States v. Whitehorn*, 710 F.Supp. 803, 827 (D.D.C.1989), *reversed on other grounds in United States v. Rosenberg*, 888 F.2d 1406 (D.C.Cir.1989). In this regard, the Tenth Circuit Court of Appeals has declared that:

> The Government has no obligation to disclose possible theories of the defense to a defendant. If a statement does not

contain any expressly exculpatory material, the Government need not produce that statement to the defense. To hold otherwise would impose an insuperable burden on the Government to determine what facially non-exculpatory evidence might possibly be favorable to the accused by inferential reasoning. We are confident that the Supreme Court did not intend the *Brady* holding to sweep so broadly. *United States v. Comosona,* 848 F.2d 1110, 1115 (10th Cir. 1988). See: *United States v. Peltier,* 553 F.Supp. 890, 899 (D.N.D.1982), *affirmed after remand,* 800 F.2d 772 (8th Cir. 1986), *cert. denied,* 484 U.S. 822, 108 S.Ct. 84, 98 L.Ed.2d 46 (1987) ("[T]he prosecution has no obligation to communicate preliminary, challenged or speculative information.").

▮ The Pennsylvania Supreme Court has observed similarly that the prosecution is not required to disclose to the defense "every fruitless lead followed by investigators of a crime." *Commonwealth v. Crews,* 536 Pa. 508, 531, 640 A.2d 395, 406 (1994). See: *Moore v. Illinois, supra,* 408 U.S. at 795–797, 92 S.Ct. at 2568–2569, 33 L.Ed.2d at 713–714; *United States v. Sedgwick,* 345 A.2d 465, 473–474 (D.C.App.1975), *cert. denied,* 425 U.S. 966, 96 S.Ct. 1751, 48 L.Ed.2d 210 (1976). "Likewise, although the prosecution must produce evidence reflecting that someone other than the defendant may have committed the crime, *Brady* does not create a right to information concerning all possible suspects, particularly if the number of such suspects is large and evidence of their possible involvement is slight." *United States v. Whitehorn, supra,* citing *Jarrell v. Balkcom, supra.* (footnote omitted). "The mere existence of other suspects is not 'evidence favorable to the accused,' but is presumably the expectation rather than the exception. Nor does investigative followup of a lead ... raise a presumption that another suspect's identity is evidence favorable to the accused which is material to guilt or punishment." *Commonwealth v. Crews, supra,* 536 Pa. at 508, 640 A.2d 395.

### III. Standard of Review and Burden of Proof

▮ The federal courts have held that determinations of the materiality of evidence withheld from the defense and of

the possible effect of such nondisclosures on the outcome of the trial are mixed questions of law and fact, which are generally subject to de novo review on appeal. See: *United States v. Johnson*, 977 F.2d 1360, 1380 (10th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1024, 122 L.Ed.2d 170 (1993); *United States v. Rogers*, 960 F.2d 1501, 1510 (10th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 817, 121 L.Ed.2d 689 (1992); *United States v. Phillip*, 948 F.2d 241, 250 (6th Cir.1991), *cert. denied*, 504 U.S. 930, 112 S.Ct. 1994, 118 L.Ed.2d 590 (1992); *United States v. Lai*, 944 F.2d 1434, 1440 (9th Cir.1991), *cert. denied*, 502 U.S. 1062, 112 S.Ct. 947, 117 L.Ed.2d 116 (1992); *United States v. Rivalta*, 925 F.2d 596, 597–598 (2d Cir.1991), *cert. denied*, 502 U.S. 875, 112 S.Ct. 215, 116 L.Ed.2d 173 (1991); *United States v. Marashi*, 913 F.2d 724, 731–732 (9th Cir.1990). Cf. *United States v. Ward*, 989 F.2d 1015, 1017 (9th Cir.1992) (appellate court reviews questions of constitutional law de novo); *United States v. Lewis*, 979 F.2d 1372, 1374 (9th Cir.1992) (appellate court reviews de novo question of whether due process has been violated). "Where the legal issues predominate in mixed questions of law and fact, [appellate courts] review the question de novo." *People of the Territory of Guam v. Borja*, 983 F.2d 914, 918 (9th Cir.1992). See also: *United States v. Murillo*, 933 F.2d 195, 198 (3d Cir.1991); *United States v. Ortiz*, 878 F.2d 125, 126–127 (3d Cir.1989). However, where the analysis is primarily a factual one, the trial court's findings of fact are binding upon a reviewing court, unless those findings were clearly erroneous. See: *United States v. McConney*, 728 F.2d 1195, 1202–1204 (9th Cir.1984) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). See also: *United States v. Hill*, 976 F.2d 132, 134 (3d Cir.1992); *United States v. Perdomo*, 929 F.2d 967, 969 (3d Cir.1991).

"A showing of materiality ... is 'not satisfied by a mere conclusory allegation that the requested information is material to the preparation of the defense.'" *United States v. Cadet*, 727 F.2d 1453, 1466 (9th Cir.1984), quoting *United States v. Conder*, 423 F.2d 904, 910 (6th Cir.1970), *cert. denied*, 400 U.S. 958, 91 S.Ct. 357, 27 L.Ed.2d 267 (1970). "[E]vidence in the

possession of the prosecution is not exculpatory merely because the defendant so labels it." *Commonwealth v. Lochman,* 265 Pa.Super. 429, 438, 402 A.2d 513, 518 (1979). See also: *United States v. Pou, supra,* 953 F.2d at 366–367. Rather, "[t]he burden of proving the materiality of the requested and undisclosed information is always on the defendant, as the law does not require the government to prove a negative, e.g., that the requested information is *not* material." *United States v. Burger, supra,* 773 F.Supp. at 1426. See also: *United States v. Navarro,* 737 F.2d 625, 631–632 (7th Cir.1984), *cert. denied,* 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984); *United States v. Balliviero,* 708 F.2d 934, 943 (5th Cir.1983), *cert. denied,* 464 U.S. 939, 104 S.Ct. 351, 78 L.Ed.2d 316 (1983); *United States v. Robinson,* 585 F.2d 274, 280–281 (7th Cir.1978) (en banc), *cert. denied,* 441 U.S. 947, 99 S.Ct. 2171, 60 L.Ed.2d 1051 (1979); *Commonwealth v. Jones,* 432 Pa.Super. 97, 103–104, 637 A.2d 1001, 1004–1005 (1994) (en banc).

## IV. The Evidence Not Disclosed By The Prosecution

### A. The Statement of Jeffrey Beard

Jeffrey Beard, a hospital security guard, went to police headquarters on the day following the shooting of Officer Trench and made a statement in which he claimed that he had been an eyewitness to the killing. Beard stated that he had been walking on the south side of Spring Garden Street and, as he had been crossing 17th Street, he had observed a police car parked on the north side of Spring Garden Street.[3] Upon bending over to pick up a marijuana cigarette which he had dropped, Beard said he had heard two gunshots. Then, he claimed, he had seen a man run from the side of the police car and turn north on 16th Street. Beard described this man as being 5′9″ to 6′1″ in height; light skinned, but not white; wearing white sneakers, dark pants and a dark jacket; about 25 to 30 years in age; and having a flyaway haircut. This statement was reduced to writing, and Beard signed it.

3. Officer Trench's patrol car had actually been parked on 17th Street and not Spring Garden Street as Beard had claimed.

Immediately after taking Beard's statement, police took him to the crime scene for further investigation. Beard, however, was unable to identify the location of Officer Trench's patrol car, and his version of events was not consistent with other details known by police. When confronted by police with the inconsistencies in his story, Beard admitted that he had lied about witnessing the shooting in order to get out of work early. At that point, the police transported Beard back to his place of employment, seeing no reason to pursue interrogation any further.

## B. The Statement of Denise Jackson

Denise Jackson, a 27 year old drug addict, also made a statement to police on May 29, 1985, in which she claimed to be an eyewitness to Officer Trench's murder. In her statement, Jackson told police that she and a friend named "YaYa" had gone to 11th Street to buy cocaine from a man known as Pedro Sanchez. There, they were told that Pedro had gone to 17th Street; and so, Jackson and "YaYa" went to find him. As they arrived at the corner of 17th and Spring Garden Streets, Jackson said, she had observed Pedro walking south on 17th Street toward a police car which had then been parked on the west side of 17th Street, north of Spring Garden Street. Jackson said that she had seen a gun in Pedro's hand; whereupon, "YaYa" had said to her, "lets get out of here." As Jackson and "YaYa" had walked away, Jackson said, she had heard three gunshots.

According to Jackson's statement, she had known Pedro for about a year and had seen him every other day, usually in the area of 11th and Wallace Streets. She described Pedro as being 20 to 21 years of age; 5′6″ in height; 150 to 160 pounds and well built; wearing short hair combed straight back and an auburn colored tail at the base of his neck; having a thin mustache; and a tan complexion. According to Jackson, Pedro owned a bluish green, souped-up car, with big tires, which could have been a Dodge Dart. Also, Jackson said, two weeks prior to Officer Trench's murder she had observed Pedro point what appeared to be a .38 caliber revolver at

another man during an argument over a drug deal. Finally, at the conclusion of her interview with police, Jackson was shown a photo array from which she selected Santiago's photograph and replied: "This looks like Pedro, but I'm not sure."

## C. Transcripts of Telephone Calls to Police Radio

In November, 1987, during the pendency of Santiago's post-trial motions, the Commonwealth disclosed to the defense additional materials which had not been disclosed during pre-trial discovery. Included in this information were transcripts of fifteen telephone calls to police within a few days of the murder of Officer Trench. These calls had come from persons who had identified someone other than Santiago as a possible perpetrator or otherwise claimed to possess information helpful to the police investigation. Several callers expressly or impliedly had connected Officer Trench's killing to the radical organization MOVE in retaliation for the May 13, 1985 police bombing of the MOVE house in which eleven members of the organization had been killed. Four of these calls had been from anonymous males. A fifth call had been made by a man identifying himself as William J. Simmons from the MOVE residence, who had said "I'm going to kill every fucking goddam[n] police on your fucking force." Timothy Pardo, a prison inmate, had reported that he overheard other prisoners saying that David Africa knew who had killed Officer Trench. An anonymous male had called and reported a disturbance at 27th and Berks Streets and then had claimed that he killed Officer Trench because he had been imprisoned for three years. The caller further had said that he was going to kill another police officer.

Two calls had been received from an anonymous male identifying a Willie C. Bullock, Jr. as being Officer Trench's slayer. Another anonymous caller had said that a man named "Black Rob" was bragging about killing Officer Trench. A caller who identified himself as Patrick Fields said that on the morning of Officer Trench's murder, at or about 2:25 a.m., he had seen a suspicious looking, white male walking near the

corner of Delaware Avenue and Spring Garden Street and felt that this male "possibly could have had some kind of connection" with the killing. An anonymous call had been received from a man who said that men named Charlie Edwards and Marvin McClain had been smoking angel dust on the day prior to Officer Trench's murder and had said that "they was gonna get a cop." Yet another anonymous caller had identified the perpetrator as a federal parolee named Richard Jenkins, whom the caller said had been at 18th and Spring Garden Street to make a drug purchase. The caller had speculated that Jenkins may have killed Officer Trench to avoid being picked up for a parole violation, but had given no basis for his conclusion. Another caller, identifying himself as a resident of 16th and Spring Garden Streets, had told police that he heard that people in the neighborhood had armed themselves and were gunning for police. This caller had said further that he heard that the person who had shot Officer Trench had been a friend of the man who had been in a fight with and had been chased by police on the previous day. The caller had said that he thought the name of the killer was Jose Gonzales and that he lived at 1725 Spring Garden Street. Finally, a caller who identified himself as Jose Rivera or Rivero, had said that he had been assisting police with the investigation and had found something that might help them.

### D. Evidence contrary to the Commonwealth's theory of the case

Following the shooting, police began to interview people who had lived in the area and other persons who were known to have been in the area at relevant times. Several of the statements were not disclosed to the defense prior to Santiago's trial and, in fact, were not disclosed by the Commonwealth until May and July of 1992, after the case had been remanded for a new trial by the Superior Court. Although none of the persons making these statements had been eyewitnesses to the shooting of Officer Trench, Santiago asserted that these persons had seen or heard things inconsistent with the Commonwealth's evidence at trial, or, alternatively, had failed to observe things which were consistent with the Com-

monwealth's trial evidence. The statements included within this category of evidence which was not disclosed to the defense are as follows.

## 1. Statements of Cecilia Spencer

Cecilia Spencer, who resided on 17th Street, approximately one-half block from the scene of the shooting, was interviewed twice by police on May 28, 1985, once at 4:13 a.m., and again at 7:45 a.m. In her statements, Spencer said that, at or about 2:00 a.m., she had been awakened by a single, loud gunshot, followed by a soft, male voice saying, "please help me." According to Spencer, this voice seemed to be coming from Officer Trench's patrol car. Spencer also said that she had heard someone running and that it sounded as if that person had run north on 17th Street and then west onto Brandywine Street. Upon hearing the gunshot, Spencer said she had looked out her window and had seen that the patrol car's interior lights, flashing and dome light and tail lights were lighted. Spencer, however, did not see any other cars on the street, nor did she see the person who had run away.[4]

## 2. Statement of Margaret Harris

On May 29, 1985, police interviewed Margaret Harris, who had resided in a third floor apartment on Spring Garden Street, near its intersection with 17th Street. Harris told police that on May 28, 1985, at 2:30 a.m., while lying in bed, she had heard two or three loud noises which sounded like the banging of trash cans or firecrackers. Harris said that, after hearing the noises, she had put on her glasses and had looked out the window, but had not seen anything. She said, however, that a few seconds prior to hearing the noises, she had heard a deep male voice say, "Hey Buddy." This voice, according to Harris, sounded Caucasian in that she did not notice any accent.[5]

---

4. In her initial statement, Spencer said that she had heard an argument prior to hearing the gunshot. However, in her second statement to police, she stated that she had heard the argument on a prior evening.

5. Margaret Harris died on August 6, 1992.

### 3. Statement of Jeffrey Dardozzi

Jeffrey Dardozzi, who lived in an apartment on 17th Street, was interviewed by police on May 31, 1985. On the night of Officer Trench's murder, Dardozzi said that he had been lying awake in bed, when, around 2:00 a.m., he had heard two gunshots. About thirty seconds later, according to Dardozzi, he had heard voices and other sounds, but had not been able to make out what was being said. Of the sounds which he had heard, Dardozzi said, he could only distinguish one voice, which sounded like a woman's. Upon hearing these sounds, Dardozzi got up and looked out the window but was unable to see either a patrol car or persons on the street.

### 4. Statement of Joseph Pineiro

Pineiro resided in an apartment on Spring Garden Street at the time of the shooting and was interviewed by police on May 29, 1985. He said he had been sitting at his table listening to the radio when at 2:28 a.m., he had heard two gunshots. Pineiro said that he had heard no sound at all prior to the shots, but, one or two minutes thereafter, he had heard a man's voice say, "Come on, Lindsay or something like that."

### 5. Statement of Edward Hargrove

Edward Hargrove, who resided in the same apartment building on 17th Street as Jeffrey Dardozzi, was interviewed by police on May 30, 1985. Hargrove had been visiting his family in South Philadelphia and had returned home at about 2:35 a.m., on May 28, 1985. He had driven south on 17th Street and had parked his car on the northwest corner of 17th and Brandywine Streets. Upon getting out of his car he had noticed a police car parked on the east side of 17th Street, near Spring Garden Street. Hargrove, however, had not heard any gunshots, nor had he seen anyone walking or running on either 17th Street or Brandywine Street.

### 6. Statement of Kenny Gilmore

Kenny Gilmore was picked up by police shortly after the shooting of Officer Trench and taken to the Homicide Division for questioning. Gilmore had been standing outside a friend's

house at 17th and Wallace Streets at the time of the shooting. He denied that he had heard any gunshots or that he had seen anyone running in the area. However, Gilmore said that prior to his being picked up by police, two Spanish guys had walked by, one of whom had asked the other if he had heard any shots, to which the other had replied that he had not heard any shots. Gilmore said he did not know the Spanish men, but indicated that they also had been picked up by police. Gilmore also told police that he had seen three cars driving on 17th Street.

### 7. Statement of Russell Bond

Bond was questioned by police at 4:30 a.m., on May 28, 1985. He said that he had been sitting on a friend's steps at 18th and Mount Vernon Streets, which was located a few blocks from the scene of the shooting, when, at or about 2:45 a.m., he had heard three loud noises that sounded like fire-crackers. About twenty minutes later, Bond and his friend were picked up by police for questioning. Bond told police that he had heard nothing other than the shots and that he had not seen anyone walking on 17th Street.

### 8. Statements of Louis Galban [6]

Louis Galban was twice interviewed by police on May 28, 1985, at 5:50 a.m., and again at 11:20 a.m. In his initial statement, Galban indicated that he had been sitting at the corner of 17th and Wallace Streets with a man named Pedro Roldan, when he heard two gunshots coming from the area of 17th and Spring Garden Streets. After hearing the shots, Galban said, he had observed a gray, two door car, with New Jersey license plates, drive south on 17th Street and then turn west onto Brandywine Street. In the same statement, however, Galban also said that he had heard the gunshots as this

---

**6.** Unlike the other witness's statements, which were not disclosed to the defense until May and July, 1992, the statements of Louis Galban had been turned over by the Commonwealth in November, 1987, while Santiago's post-trial motions were pending before the trial court. Santiago argued post-trial that the Commonwealth's failure to disclose Galban's statements, as well as the transcripts of the calls to police radio, constituted a violation of *Brady v. Maryland, supra.*

vehicle turned onto Brandywine Street. He described the vehicle's occupants as being two white guys; the driver had been heavy with long light brown hair and the passenger had been thinner with the same type hair.

In his second statement to police, Galban said that he had known Wilfredo Santiago and that, on the evening prior to Officer Trench's murder, he had observed Santiago start a fight and had seen a policeman chase Santiago after the fight. About two hours after Santiago had been chased by police, Galban said he saw Santiago riding a bike and looking "mad." Galban further told police that, approximately one-half hour before hearing the gunshots, he had observed a patrol car parked on 17th Street with its interior lights on. After hearing the gunshots, however, Galban said, the patrol car's lights had no longer been lighted. Finally, Galban informed police that, after hearing the shots, he had seen a black male walking on 17th Street between Green and Mount Vernon Streets.

### E. Material That Could Have Impeached Testimony

#### 1. Evidence of Undisclosed Plea Agreement Between the Commonwealth and Howard Long

Howard Long, who was incarcerated with Santiago following Santiago's arrest, testified at Santiago's trial that Santiago had made an inculpatory statement admitting that he had murdered Officer Trench. Upon direct examination by the prosecuting attorney, Long testified that he had made no deal in exchange for his testimony, except that his cooperation in the Santiago case would be made known to the sentencing judge if he were convicted in an outstanding robbery case. The prosecutor's questioning suggested that, if Long were convicted in the robbery case, the Commonwealth would be seeking to have a five year mandatory minimum sentence imposed because of Long's possession of a firearm during the commission of that crime.

After Santiago's trial and conviction, Long pleaded guilty to the robbery charge, but a related charge of aggravated assault arising from the same incident was dropped by the Common-

wealth. At the time of sentencing, the presiding judge, the Honorable Lynne Abraham,[7] determined that there was insufficient evidence to support the imposition of the mandatory minimum sentence sought by the Commonwealth. After hearing testimony regarding Long's cooperation in the Santiago case, Judge Abraham sentenced Long to serve a term of imprisonment of eleven and one-half months to twenty-three months, a sentence in the standard range of the Sentencing Guidelines. Subsequently, in 1990, Long was again before Judge Abraham for sentencing as a result of a probation violation. At this time, Judge Abraham made the following comments:

> I want the record to reflect that I am extremely sorry that I had to do this, [and] have a violation hearing. That Mr. Long knows that if he comes back in front of me with a violation, and he has two in the case, then significantly his cooperation went for the first case. Had he not cooperated in the first case at all, I would have given him ten to twenty, not five to twenty.
>
> . . . .
>
> I am the saddest person in the world beside yourself to see you in here, Mr. Long. You can't even take the benefits of a bargain you made. You can't even take advantage of the best deal that you ever got in your whole life from me which was, in a sense, time served and probation.

It is asserted by Santiago that the unexplained dropping of the aggravated assault charge against Long, the fact that no mandatory minimum sentence was imposed on the robbery charge to which Long pleaded guilty, together with the comments of Judge Abraham in sentencing Long for violating probation, suggest a secret deal between Long and the Commonwealth which was not disclosed to the defense prior to Santiago's trial. At the very least, Santiago contends, the prosecutor at his trial intentionally misled the jury into believing that Long would receive a mandatory minimum sentence

7. Judge Abraham is now the District Attorney of Philadelphia County.

of five years despite his cooperation with the Commonwealth by testifying at Santiago's trial.

### 2. Memorandum Regarding Conversation With Jailhouse Informant Frank McAleese

In a handwritten memo, dated June 5, 1985, Detective Albert Nespoli noted that a jailhouse informant named Frank McAleese had called him and said "he has Santiago talking to him." The remainder of the memo included the details of an inculpatory statement which Santiago had allegedly made to McAleese in which Santiago had admitted that he killed Officer Trench. McAleese was brought to the Homicide Division on June 10, 1985, where he made a formal statement regarding Santiago's jailhouse confession. At trial, however, McAleese denied that he had ever talked with Santiago about the killing of Officer Trench. McAleese admitted signing the formal statement, but said that the document had been prepared by the police and that he had signed it because he was acting as an agent for the homicide detectives and expected favorable treatment. Detective Nespoli testified that he had known McAleese following October, 1984, and that McAleese would call him from time to time and provide information concerning cases on which he was working. Nespoli said that McAleese first called him regarding the Santiago case "approximately June 7th." Thereafter, Nespoli testified regarding the circumstances surrounding and the details of McAleese's formal statement of June 10, 1985. The contents of this formal statement were admitted into evidence as a prior inconsistent statement and considered by the jury as substantive evidence pursuant to *Commonwealth v. Brady, supra,* 373 U.S. at 83, 83 S.Ct. 1194.

### 3. Prior Inconsistent Statement of Commonwealth Witness Jose Rosario—Pre–Polygraph Interview

At Santiago's trial, Jose Rosario testified that, on May 28, 1985, at about 1:00 or 1:30 a.m., he and his girlfriend had seen Santiago riding a bicycle a few blocks from where Officer Trench was later killed. Rosario said at trial that, as Santiago had ridden past, he had dropped a gun and had had to stop to pick it up. At no time prior to trial, however, did Rosario say

that he had seen Santiago with a gun. In fact, on July 12, 1985, upon being interviewed prior to taking a polygraph examination, Rosario told police that he had not seen Santiago with a gun on the morning that Officer Trench had been killed. This statement was not disclosed to the defense until November, 1987, when Santiago's post-trial motions were pending. Other inconsistent statements by Rosario, however, were utilized by the defense at Santiago's trial to impeach Rosario's testimony with respect to his having seen Santiago with a gun. Indeed, Rosario was cross-examined at Santiago's trial as follows:

Q. And then on the statement that you had just testified this afternoon is true. Do you remember this question and this answer? "Question: Did you see Cito with a gun that night?" "Answer: No." "Question: Did he tell you he had a gun that night?" "Answer: No." "Question: Have you ever seen Cito with a gun?" "Answer: No".

And that's all here on this statement that you testified to this afternoon was true isn't it sir? Do you want to look at it?

A. I have told you as I said earlier that everything. I did not never mention to the police that he had a gun during that time.

. . . .

Q. And just a few minutes ago she asked you about your statement and you said everything I told the detectives in my statement was true.

Do you remember saying that just a moment ago?

A. Yes, I do.

Q. And in your statement you're asked a question "That night was Cito carrying any packages or bags or anything of that nature" and you said "no, not that I noticed." And you were asked did you see Cito with a gun that night and in your statement that you say is true, and the answer is "No".

Is that what you stated, sir?

A. Yes, that's on the statement.

478

Q. Mr. Rosario, during our investigation Mr. McGill and I came out to your house is that correct?

A. Yes, sir.

Q. And did we interview you in your home with your mother present?

A. Yes.

. . . .

Q. ... And everytime we have spoken to you you have always told us "I never saw Cito with a gun that night" haven't you?

A. Yes, I have.

. . . .

Q. And everytime you have spoken to us you told us the same thing, that you didn't see Mr. Santiago at 1:00 or 1:30, that you didn't see him with a gun, and you didn't see anything on his person; is that right?

A. Yes.

Q. And everytime you told us, you told us that was the truth, is that right?

A. Correct.

Q. And you came into the courtroom at the pretrial hearing and put your hand on the Bible just like you did today?

A. Right.

Q. And you swore to tell the truth?

A. Right.

Q. And you said then you didn't see him with a gun, you didn't see him with anything, isn't that right?

A. That's right.

Q. And then you came in and put your hand on the Bible today again and swore to tell the truth again and us that the statement you gave the Homicide detectives was true. And now after saying that, even up to a few moments ago, now you're saying that all of that is not true, is that right?

A. What am I saying?

Q. Now, you're saying that what is here, the part about the gun, what you said previously and you have told us everytime we have seen you, that the statement is not true?

A. Right.

### 4. Radio Transmissions Regarding The Street Fight Involving Santiago On The Evening Prior to Officer Trench's Murder

At Santiago's trial, Police Officer Ismael Cruz testified that on May 27, 1985, at or about 7:40 p.m., he had broken up an altercation between Santiago and two men named Victor and Virgilio Colon. Cruz said that he had observed the outline of a gun beneath the tee shirt worn by Santiago. When he had attempted to question Santiago, Cruz testified, Santiago had fled the scene on a ten speed bicycle. Then, according to Cruz, he had informed his backup, Officer Noel Maldonado, that the suspect being sought was believed to be armed. Thereafter, Santiago returned to 17th and Wallace Streets on foot and was chased by Officer Cruz to the home of his aunt, where he was eventually apprehended after an altercation between police and members of Santiago's family.

During the course of the street altercation and Santiago's subsequent flight, several transmissions had been made over police radio regarding the nature of the incident. In one transmission, Officer Maldonado had reported that Officer Cruz was chasing a Hispanic male who had fled when police attempted to make a pedestrian stop to question him. No mention was made by Maldonado, however, that the suspect was believed to be armed. It is this omission which Santiago asserts was material, in that it would have impeached Officer Cruz's trial testimony that he had observed the outline of a gun in Santiago's waistband and had so informed Officer Maldonado. The transcripts of the police radio transmissions were not disclosed to the defense until November, 1987, after trial had concluded and Santiago's post-trial motions were pending.

## V. The Materiality Of The Information Withheld By The Prosecution

### A. The Statement of Jeffrey Beard

In granting Santiago's motion to dismiss, the trial court deemed the statement of Jeffrey Beard to be "the most outstanding example in this case" of exculpatory evidence which was withheld by the Commonwealth.

After careful review, we are unable to agree with the trial court's conclusion that the statement of Jeffrey Beard was material and exculpatory evidence which the prosecution had a constitutional duty to disclose to the defense. This statement, rather, fell into the category of an initial lead which turned out to be fruitless following additional police investigation. Indeed, Beard's inability to identify the location where Officer Trench had been shot and his subsequent admission that he had lied about witnessing the crime rendered his initial statement to police worthless and of no evidentiary value. A different conclusion is not compelled merely because the initial statement of Beard had been reduced to writing and signed. If this were so, the police files would be virtually an open book to defense counsel and all recorded statements by witnesses would be subject to mandatory disclosure, no matter how unreliable or untruthful those statements had been determined to be by succeeding police investigation. Disclosure of such material is not required by *Brady v. Maryland, supra,* 373 U.S. at 83, 83 S.Ct. 1194. Once the police determined that Beard had not been an eyewitness to Officer Trench's murder and that his initial statement had been worthless to their investigation, there was no duty on the part of the Commonwealth to disclose the statement to the defense.

### B. The Statement Of Denise Jackson

The trial court made no determination whether the statement of Denise Jackson was material and exculpatory and, therefore, whether the prosecution's failure to disclose this statement constituted a *Brady* violation. Santiago argues that Jackson's identification of the perpetrator as "Pedro

Sanchez" and her description of Sanchez in a manner inconsistent with his own appearance constituted material and exculpatory evidence which should have been disclosed to the defense. The Commonwealth asserts that Jackson's statement to police, in reality, was inculpatory of Santiago in that Jackson had identified Santiago's photograph and had said that he was the man she knew as "Pedro Sanchez," and whom she had seen at the time of Officer Trench's murder. The Commonwealth also contends that Jackson's description of Sanchez was generally consistent with Santiago's appearance, and points out that, upon being initially picked up by police for his participation in the neighborhood altercation on the evening prior to Trench's murder, Santiago had identified himself as "Alfred Sanchez."

The Commonwealth does not dispute that Jackson was an eyewitness to the shooting. If, as the Commonwealth now argues, her testimony was inculpatory, the record fails to offer any explanation for the prosecution's failure to call her as a Commonwealth witness at trial.[8] Nevertheless, after careful study, it seems clear that the testimony of this witness was not exculpatory and not so favorable to the defense as to require disclosure under *Brady*. Jackson's physical description of the man whom she had known as "Pedro Sanchez" and whom she had identified as Officer Trench's killer, was generally consistent with Santiago's appearance at the time of his arrest in all respects but the style of his hair. Moreover, upon being shown a photographic array, Jackson tentatively had identified Santiago as looking like "Pedro Sanchez." Under these circumstances, Jackson's statement to police cannot be characterized as evidence favorable to Santiago. The prosecutor at Santiago's trial committed no constitutional violation by failing to disclose this statement to the defense in pre-trial discovery.

## C. The Telephone Calls to Police Radio

The several telephone calls to the police radio in the days following Officer Trench's murder, mostly by anonymous

---

8. Jackson's name was on a list of more than two hundred potential witnesses which the prosecutor disclosed to the defense prior to Santiago's trial.

callers, which variously identified the perpetrator or perpetrators as being members of MOVE; Willie C. Bullock, Jr.; a man known as "Black Rob"; Charlie Edwards and Marvin McClain; Richard Jenkins; and Jose Gonzales, did not constitute material and exculpatory evidence in Santiago's favor which the prosecution had a constitutional duty to disclose to the defense. While it is true that a prosecutor must disclose evidence which indicates that someone other than the accused committed the crime, he or she need not disclose to the defense information that is merely preliminary or speculative in nature. A prosecutor also is not required to disclose the identity of all possible suspects who have been investigated in connection with a crime. Here, the telephone calls to the police radio consisted of nothing more than unsubstantiated hearsay and rumor which would not have been admissible evidence at trial. Santiago, although in possession of the transcripts of these telephone calls after November, 1987, has offered no evidence whatsoever that the information contained therein would have led to the discovery of admissible evidence favorable to the defense if the transcripts had been disclosed by the prosecutor prior to trial. "Certainly, information withheld by the prosecution is not material unless the information consists of, or would lead directly to, evidence admissible at trial for either substantive or impeachment purposes." *United States v. Phillip, supra,* 948 F.2d at 249. Under these circumstances, we conclude that there was no material information in these transcripts which the prosecutor was obligated to disclose to the defense prior to trial.

### D. Statements by Cecilia Spencer, Margaret Harris, Jeffrey Dardozzi, Joseph Pineiro, Edward Hargrove, Kenny Gilmore, Russell Bond and Louis Galban

At the hearing on his motion to dismiss, Santiago argued that the statements of these eight persons, who had been in the general area of the shooting but who had not actually witnessed the crime, were significant in that they contradicted the following crucial aspects of the Commonwealth's trial evidence: (1) that immediately following the shooting of Offi-

cer Trench, Santiago had fled on a bicycle directly north on 17th Street; (2) that Santiago had been riding a bicycle in the general area of the shooting for approximately two hours prior to the commission of the crime; and (3) that only a single perpetrator had been involved in the shooting of Officer Trench. Specifically, Santiago contends that Cecilia Spencer's observation that she heard someone running west on Brandywine Street following the shooting contradicted the Commonwealth's theory of Santiago's flight path, as did Jeffrey Dardozzi's failure to see anyone on 17th Street upon looking out his window after hearing gunshots. Similarly, Santiago asserted, Edward Hargrove also failed to observe anyone fleeing north on 17th Street despite the fact that, at the relevant time, he had been driving on 17th Street while returning home from a visit with relatives.

As for the statements of Kenny Gilmore, Russell Bond and Louis Galban, Santiago argues that these three individuals had been hanging out on the street in the general area of the shooting, and, yet, each had failed to observe anyone fleeing north on 17th Street following Officer Trench's murder. In addition, Santiago contends that Gilmore, Bond and Galban would have contradicted Commonwealth evidence that he was "stalking" the area prior to the murder by riding a bicycle throughout the neighborhood. Thus, Santiago argues, Gilmore, Bond and Galban all had been in the area prior to the crime and, contrary to the observations of several Commonwealth witnesses at his trial, had not seen Santiago riding a bicycle in the area prior to the shooting of Officer Trench.

Finally, Santiago contends that voices heard by Joseph Pineiro and Margaret Harris were also contradictory of evidence offered by the Commonwealth at trial. Shortly after hearing gunshots, Pineiro heard someone say "Come on Lindsay or something like that." This observation, Santiago asserts, indicates that at least two perpetrators may have been involved in Officer Trench's murder, thus, contradicting the Commonwealth's theory that Santiago acted alone. Margaret Harris, a few seconds prior to hearing gunshots, heard a voice with no accent, which sounded Caucasian, say "Hey Buddy."

Santiago, who is Hispanic, argues that Harris heard the voice of the actual perpetrator, who was not Hispanic.

■ With respect to the statements of Spencer, Harris, Dardozzi, Pineiro, Hargrove, Gilmore, Bond and Galban, the trial court determined that such statements constituted "a second category" of material and exculpatory evidence which the Commonwealth had failed to disclose to the defense prior to Santiago's trial. In addressing the materiality of these statements, we observe initially that Santiago's argument with respect to the failure of persons near the crime scene to observe him fleeing north on 17th Street immediately after Officer Trench's murder is seriously flawed. Contrary to Santiago's suggestion, the Commonwealth presented no evidence whatsoever at trial regarding Santiago's immediate path of flight after he allegedly had shot Officer Trench. Rather, the Commonwealth's evidence was that approximately ten minutes after the shooting, Santiago had been observed riding a bicycle north on 17th Street, several blocks from the murder scene. That other persons had failed to observe Santiago closer in proximity to the scene and time of the crime did not, in any way, conflict with the Commonwealth's evidence at trial. As such, we are unable to conclude that the statements of Spencer, Dardozzi, Hargrove, Gilmore, Bond and Galban regarding their failure to observe Santiago, or anyone else, fleeing from the crime scene, were either favorable or material to Santiago's defense.

■ Had any of these persons observed someone other than Santiago fleeing from the scene of Officer Trench's murder, such information would clearly have been material evidence for the defense which would have been subject to mandatory disclosure under *Brady v. Maryland, supra,* 373 U.S. at 83, 83 S.Ct. 1194. However, *Brady* does not require a prosecutor to disclose information which merely fails to incriminate a defendant. Only expressly exculpatory evidence must be disclosed. Otherwise, a prosecutor would be obligated to anticipate all possible defense theories and to disclose all information which the defense may be able to portray in a

favorable light through inferential reasoning. Such a requirement, as we have already observed, would require the Commonwealth to open its files to the defense. This is contrary to the teaching of *Brady v. Maryland, supra,* 83, 83 S.Ct. 1194.

For similar reasons, we perceive nothing exculpatory or material in the failure of Gilmore, Bond or Galban to see Santiago riding a bicycle through the neighborhood in the hours preceding the shooting. This was negative evidence. It did not negate the Commonwealth's evidence that other persons had observed Santiago riding through the area on a bicycle in the hours preceding the shooting.

With respect to the statements of Margaret Harris and Joseph Pineiro, we conclude that these statements also did not contain information that was directly exculpatory. That Harris heard, prior to the shooting, an unaccented male voice which said "Hey Buddy" would in no way negate any of the evidence presented by the Commonwealth at Santiago's trial. There is absolutely no indication in the Harris statement as to the identity of the speaker, or even that the voice heard by Harris and the shooting of Officer Trench were related events. Similarly, Pineiro's statement that a few minutes after the shooting he had heard a voice say something like "Come on, Lindsay" did not negate any of the Commonwealth's evidence which implicated Santiago in the killing of Officer Trench. As with the Harris statement, there was no indication as to the identity of the speaker heard by Pineiro, and there was no reason to believe that a connection existed between this voice and the murder of Officer Trench. Thus, while counsel for Santiago may have been able to use these statements to construct by inference arguments that might have been favorable to Santiago's defense, there was no expressly exculpatory material contained in either the Harris or Pineiro statements which would have triggered the prosecuting attorney's constitutional duty to disclose such information to the defense. There was, therefore, no *Brady* violation.

### E. Existence Of Undisclosed Plea Agreement Between The Commonwealth and Howard Long

 After careful review, we find no evidence that any promise had been made to Howard Long regarding his outstanding robbery case, except that his cooperation in the Santiago trial would be made known to the court at the time Long was to be sentenced. At the hearing on Santiago's motion to dismiss, the Commonwealth introduced into evidence the transcript of Long's sentencing hearing wherein it was explicitly stated on the record that there was no agreement regarding the sentence that Long was to receive. Similarly, there is no evidence that the prosecutor intentionally misled the jury as to Long's facing a mandatory minimum sentence upon conviction on the robbery charge. In fact, the Commonwealth sought the imposition of a mandatory minimum sentence at Long's sentencing hearing, but the sentencing judge found insufficient evidence upon which to impose such a sentence. Under all of these circumstances, we conclude that Santiago failed to demonstrate the existence of any material, exculpatory information which had been withheld by the Commonwealth regarding the witness, Howard Long.

### F. The Memorandum Regarding Jailhouse Informant Frank McAleese

 The memorandum regarding Frank McAleese's phone call to Detective Nespoli on June 5, 1985, in which McAleese said that he had Santiago talking to him, the defense contends, would have supported the defense theory that McAleese was an agent for the Commonwealth whose mission it was to elicit incriminating statements from Santiago. If this memorandum had been disclosed to the defense, Santiago argues, it would have been supportive of a pre-trial motion seeking suppression of the inculpatory statement allegedly made to McAleese. It was also asserted that the memorandum would have impeached Detective Nespoli's trial testimony that McAleese had first contacted him about the Santiago case on June 7, 1985.

At most, the memorandum at issue would have established that McAleese had initiated the conversation with Santiago in

which Santiago had allegedly admitted killing Officer Trench. While this may have been favorable to Santiago's suppression motion, we are not persuaded that it was material thereto. That McAleese may have initiated conversations with Santiago does not establish that he had done so at the behest of the Commonwealth. There is, therefore, no reasonable probability that Santiago's suppression motion, as to the inculpatory statement which he allegedly made to McAleese, would have been decided differently had the memorandum been disclosed by the Commonwealth during pre-trial discovery.

Similarly, the discrepancy between the memorandum which indicated that McAleese first contacted Detective Nespoli on June 5, 1985, and Nespoli's trial testimony that McAleese had first contacted him regarding the Santiago case "approximately" on June 7, 1985, was not material to the outcome of Santiago's trial. Even if the jury had been apprised of this minor discrepancy regarding the date on which McAleese had first contacted Detective Nespoli, no reasonable probability exists that the outcome of Santiago's trial would have been more favorable. The failure of the prosecutor to disclose this memorandum, therefore, was not a violation of *Brady v. Maryland, supra,* 373 U.S. at 83, 83 S.Ct. 1194.

### G. The Prior Inconsistent Statement Of Jose Rosario—Pre–Polygraph Interview

 .The statement of Jose Rosario, in the pre-polygraph interview, that he had not seen Santiago with a gun prior to Officer Trench's murder was contrary to Rosario's testimony at Santiago's trial. The statement, therefore, was relevant to enable the defense to impeach the testimony of a key Commonwealth witness. However, the statement was also cumulative of other impeachment evidence utilized by the defense at trial. Indeed, at trial, Rosario was confronted with several prior inconsistent statements in which he had denied having seen Santiago with a gun prior to Trench's murder. Therefore, "[s]ince cumulative evidence is not 'material to either guilt or punishment,' the unavailability of cumulative evidence does not deprive the defendant of due process." *United*

*States v. Sanchez,* 917 F.2d 607, 618 (1st Cir.1990), *cert. denied,* 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991) (footnote omitted). See: *Commonwealth v. Santiago, supra,* 405 Pa.Super. at 99, 591 A.2d at 1117 ("Strictly cumulative evidence cannot ... serve as grounds for a new trial [under *Brady v. Maryland* ] as it would lack sufficient effect on the proceedings."). See also: *United States v. Hahn,* 17 F.3d 502, 510 (1st Cir.1994); *United States v. Nelson,* 970 F.2d 439, 442 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 293, 121 L.Ed.2d 217 (1992); *United States v. Weintraub,* 871 F.2d 1257, 1264 (5th Cir.1989); *Smith v. Kelso,* 863 F.2d 1564, 1573 (11th Cir.1989), *cert. denied,* 490 U.S. 1072, 109 S.Ct. 2079, 104 L.Ed.2d 644 (1989); *United States v. Shelton,* 588 F.2d 1242, 1248 (9th Cir.1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 275 (1979). For this reason, we find no *Brady* violation in the prosecution's failure to disclose pre-trial the prior inconsistent statement of Jose Rosario which was contained in the pre-polygraph interview.

### H. Police Radio Transmissions Regarding Santiago's Involvement In A Street Fight On The Evening Prior To Officer Trench's Murder

Santiago argues that Officer Maldonado's transmissions over police radio about Officer Cruz chasing a fleeing suspect were significant in that Maldonado had never mentioned the fact that the suspect had been believed to be armed, as Cruz testified that he had informed Maldonado. However, at trial Officer Maldonado was cross-examined extensively as to Santiago's alleged possession of a gun during the street altercation. Maldonado said that he had seen no bulge or gun in Santiago's waistband at any time during the altercation and subsequent chase. Maldonado also testified that, upon taking Santiago into custody, he had found no weapon on Santiago's person. Finally, Maldonado was cross-examined about the police incident report which he had filled out and his failure to include therein anything about Santiago's being suspected of having had a gun. In fact, the report filed by Maldonado merely had indicated that Santiago was

picked up for investigation. The discrepancies in the testimony of Officers Cruz and Maldonado, moreover, were highlighted in defense counsel's closing argument to the jury. Therefore, while Officer Maldonado's radio transmissions may have supported defense attempts to impeach Officer Cruz's testimony regarding Santiago's alleged possession of a gun, we are unable to conclude that such information would have been material to Santiago's defense. Essentially the same information was elicited through the cross-examination of Officer Maldonado at trial. We are unable to conclude, therefore, that pre-trial disclosure of these radio transmissions would have produced a reasonable likelihood of a different verdict. Hence, the prosecutor's failure to disclose this information did not rise to the level of a constitutional violation of due process under *Brady v. Maryland.*

## I. Summary—Materiality Of The Evidence Withheld By The Commonwealth

Having carefully examined each of the items submitted by Santiago in support of his motion to dismiss, we have concluded that all of the information contained therein was either not exculpatory or not material to Santiago's defense. The prosecutor's failure to disclose these items, therefore, did not violate *Brady v. Maryland.* As such, we are forced to conclude that the trial court erred by dismissing the prosecution because of the failure of the Commonwealth to disclose information to the defense.

Moreover, even if by some stretch of imagination, a *Brady* violation can be found, the conduct of the prosecuting attorney in this case was not so egregious as to implicate constitutional guarantees against being placed twice in jeopardy for the same offense.

## VI. Double Jeopardy Implications Arising From A Violation Of Brady v. Maryland

It has been observed that "[t]he *Brady* rule applies in situations where, after trial, it is discovered that the prosecution had material information of which the defense was

unaware." *United States v. Pou, supra,* 953 F.2d at 366. *Brady v. Maryland* "[i]s part of the criminal defendant's due process right to a fair trial, and the remedy for a violation of it is a new trial." *Government of the Virgin Islands v. Martinez,* 642 F.Supp. 1571, 1580 (D.Virgin Islands 1986), *affirmed,* 831 F.2d 46 (3d Cir.1987) (citations omitted). "[A] violation of due process under *Brady* does not entitle a defendant to an acquittal, but only to a new trial in which the convicted defendant has access to the wrongfully withheld evidence." *United States v. Davis,* 578 F.2d 277, 280 (10th Cir.1978). The Third Circuit Court of Appeals has held specifically that the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution "may [not] be invoked to supplement the remedies contemplated by *Brady.*" *United States v. Coleman,* 862 F.2d 455, 458 (3d Cir.1988), *cert. denied,* 490 U.S. 1070, 109 S.Ct. 2074, 104 L.Ed.2d 638 (1989). In so holding, the Court reasoned as follows:

> Unlike the double jeopardy analysis, which places a premium upon the defendant's right to one prosecution, due process simply requires that the defendant be treated fairly. The awarding of a new trial to remedy a *Brady* violation insures that the defendant will be able to make full use of the exculpatory evidence during the subsequent proceeding. Additionally, such a limited remedy furthers the societal interest in prosecuting criminal defendants to conclusion.

*Id.* at 458–459. Under the Fifth Amendment, double jeopardy will be implicated only by prosecutorial misconduct when the prosecutor has engaged in such misconduct with the intent to provoke the defendant into successfully moving for a mistrial. *Oregon v. Kennedy,* 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). Thus, if the prosecutor's misconduct does not result in a mistrial, the Double Jeopardy Clause of the United States Constitution will not be violated by allowing the defendant to be retried after he has been granted a new trial on appeal. See: *Beringer v. Sheahan,* 934 F.2d 110 (7th Cir.1991), *cert. denied,* 502 U.S. 1006, 112 S.Ct. 641, 116 L.Ed.2d 658 (1991); *United States v. Head,* 697 F.2d 1200,

1206 (4th Cir.1982), *cert. denied,* 462 U.S. 1132, 103 S.Ct. 3113, 77 L.Ed.2d 1367 (1983). Compare: *United States v. Wallach,* 979 F.2d 912, 915–917 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993).

In *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321 (1992), which was decided only eleven days prior to the hearing on Santiago's motion to dismiss in the instant case, the Pennsylvania Supreme Court considered, under the Pennsylvania Constitution, the issue of "whether the double jeopardy clause bars retrial following intentional prosecutorial misconduct designed to secure a conviction through the concealment of exculpatory evidence...." *Id.* at 179, 615 A.2d at 322. In *Smith,* the defendant had been convicted of participating in the murder of Susan Reinert and her two children and had been sentenced to death. On direct appeal, Smith was granted a new trial on grounds that inadmissible hearsay evidence had been admitted at his trial.[9] Prior to being retried, Smith discovered that the prosecution had failed to disclose to the defense that: (1) the Commonwealth's key witness had been awaiting sentencing for unrelated crimes and, in fact, had received favorable treatment thereon as a result of his cooperation with the Commonwealth; and (2) during trial, the existence of evidence both exculpatory and material to the defense had been discovered by the Commonwealth and intentionally withheld from the defense. The evidence withheld from the defense consisted of grains of sand which had been lifted from the victim's feet during an autopsy. This was consistent with Smith's defense that the crime had been committed at the New Jersey shore by others, and not by him in Pennsylvania as the Commonwealth had sought to prove.

Smith filed a motion to dismiss, hearings were held thereon, and the trial court found as fact that the prosecutorial misconduct alleged by Smith had occurred. Despite this finding, the trial court denied the motion to dismiss, and, on appeal, the

9. See: *Commonwealth v. Smith,* 523 Pa. 577, 568 A.2d 600 (1989).

Superior Court affirmed the trial court's decision.[10] The Supreme Court, however, reversed, holding as follows:

> [T]he double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. Because the prosecutor's conduct in this case was intended to prejudice the defendant and thereby deny him a fair trial, appellant must be discharged on the grounds that his double jeopardy rights, as guaranteed by the Pennsylvania Constitution, would be violated by conducting a second trial.

*Commonwealth v. Smith, supra* at 186, 615 A.2d at 325. In so holding, the Court described at length the seriousness of the prosecution's misconduct which had led to its ruling and concluded that "it would be hard to imagine more egregious prosecutorial tactics." *Id.* at 182, 615 A.2d at 323.

With respect to the Supreme Court's decision in *Smith*, the Superior Court subsequently observed:

> The effect of *Smith*, however, is not to create a per se bar to retrial in all cases of intentional prosecutorial misconduct. Rather, *Smith* merely adds to the exceptions to the general rule that when a defendant moves for a mistrial on the grounds of prosecutorial overreaching, retrial will not be barred under the Double Jeopardy Clause of the Pennsylvania Constitution. Until *Smith*, the only exception to the general rule was that espoused by *Oregon v. Kennedy* and *Commonwealth v. Simons* [514 Pa. 10, 522 A.2d 537 (1987) ]. Now, in order for double jeopardy to bar retrial in cases of prosecutorial misconduct, there must be a showing that the Commonwealth either (1) goaded [the] defendant into moving for a mistrial, or (2) specifically undertook to prejudice [the] defendant to the point of denying him a fair trial. Absent such a showing, retrial is not barred.

**10.** See: *Commonwealth v. Smith,* 404 Pa.Super. 553, 591 A.2d 730 (1991).

*Commonwealth v. Rightley,* 421 Pa.Super. 270, 279, 617 A.2d 1289, 1293–1294 (1992). See also: *Commonwealth v. Manchas,* 430 Pa.Super. 63, 79, 633 A.2d 618, 626 (1993); *Commonwealth v. Moose,* 424 Pa.Super. 579, 587, 623 A.2d 831, 836 (1993). A close reading of *Smith,* as well as subsequent decisions, makes clear that, in order to raise double jeopardy implications, prosecutorial misconduct must be deliberate, undertaken in bad faith and with a specific intent to deny the defendant a fair trial. As was observed by the Supreme Court: "The remedy of discharge without a fair and complete fact-finding procedure is extreme and will not be invoked absent deliberate bad faith prosecutorial misconduct." *Commonwealth v. McElligott,* 495 Pa. 75, 81, 432 A.2d 587, 590 (1981). Cf. *Commonwealth v. Virtu,* 495 Pa. 59, 69, 432 A.2d 198, 203–204 (1981).

In the instant case, the trial court characterized the failure of the prosecutor to disclose certain evidence to the defense as "selective discovery" and as the result of an intentional decision, rather than mere oversight. However, the withholding of evidence from the defense in the instant case, even if material, did not approach the egregious nature of the prosecutorial misconduct which was before the Supreme Court in *Commonwealth v. Smith, supra,* 532 Pa. at 177, 615 A.2d 321. As we have previously discussed at length, there was no violation of *Brady v. Maryland, supra,* 373 U.S. at 83, 83 S.Ct. 1194 in this case. However, even if we were to assume that some or all of the nondisclosed information was withheld in violation of *Brady,* we can find no evidence of record that the prosecution acted in bad faith or that it possessed a specific intent to deny Santiago a fair trial. In the absence of such a bad faith intent to deny the defendant a fair trial, even intentional prosecutorial misconduct would not violate the Double Jeopardy Clause of the Pennsylvania Constitution so as to bar a retrial of the defendant. With respect to such violations, a new trial is an adequate remedy.

For these reasons, we conclude that the trial court was in error when it barred a retrial and ordered a dismissal of the charges.

Reversed and remanded for further proceedings. Jurisdiction is not retained meanwhile.