684 A.2d 179

**COMMONWEALTH of Pennsylvania**

v.

**Albert DAIDONE, Appellant.**

**COMMONWEALTH of Pennsylvania**

v.

**Raymond MARTORANO, Appellant.**

Superior Court of Pennsylvania.

Argued May 1, 1996.

Filed Oct. 21, 1996.

Reargument Denied Jan. 3, 1997.

Thomas C. Carroll, Philadelphia, for Daidone, appellant.

F. Emmett Fitzpatrick, Jr., Philadelphia, for Martorano, appellant.

Marilyn F. Murray, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before CIRILLO, President Judge Emeritus, and DEL SOLE, J., and CERCONE, President Judge Emeritus.

DEL SOLE, Judge.

Appellants Albert Daidone and Raymond Martorano were convicted of first degree murder and criminal conspiracy in connection with the death of John McCullough. On direct appeal, this court reversed the convictions, finding that the trial court erred in denying Appellants' request for a mistrial based on prosecutorial misconduct. Prior to retrial, Appellants filed motions to dismiss, claiming reprosecution would violate the double jeopardy principles of both the state and federal constitutions. The trial court denied their motions and this appeal followed. We agree that retrial would constitute

double jeopardy under the Pennsylvania Constitution and therefore reverse the order and discharge Appellants.

The Commonwealth's only direct evidence in this case was the testimony of Willard Moran, who testified that he killed McCullough at the direction of Appellants. Moran had already been convicted of first degree murder and sentenced to death. The remainder of the three-month-long trial was devoted to the Commonwealth's attempts to link Moran and Appellants.

The question now before this court is not whether the prosecutor's conduct was such as to require a mistrial; this court has already decided that on one occasion the prosecutor's conduct was so egregious that the trial court erred when it refused to grant a mistrial. *Commonwealth v. Martorano*, 420 Pa.Super. 638, 610 A.2d 66. The question now is whether double jeopardy principles bar retrial because of the extensive and flagrant prosecutorial misconduct which occurred in this case.

■ Under both the federal and state constitutions, double jeopardy bars retrial where the prosecutor's misconduct was intended to provoke the defendant into moving for a mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *Commonwealth v. Simons*, 514 Pa. 10, 522 A.2d 537 (1987). Appellants contend that *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992), also precludes retrial whenever the prosecutor's conduct was intentionally undertaken to so prejudice the defendant as to deny a fair trial. The Commonwealth argues that *Smith* applies only if the Commonwealth deliberately conceals exculpatory evidence, no matter how outrageous the prosecutorial misconduct is otherwise. Specifically, in this case, the Commonwealth contends that it can inject totally inflammatory, prejudicial, irrelevant and inadmissible evidence in defiance of the trial court's orders, that it can incite court spectators by berating the trial judge in the court room, that it can inject personal commentary when the trial judge issues a ruling, that it can deride the trial judge's rulings in interviews with the media, and that it can

deny these Appellants the fair trial which is guaranteed by both the state and federal constitutions and when their convictions are reversed on appeal, the Commonwealth can simply try them again. We cannot agree with such a proposition.

In *Commonwealth v. Starks,* 490 Pa. 336, 416 A.2d 498 (1980), the Pennsylvania Supreme Court set forth two types of prosecutorial misconduct which would bar retrial under the double jeopardy clause: (1) prosecutorial misconduct intentionally designed to provoke a mistrial and (2) prosecutorial misconduct undertaken in bad faith to harass the defendant. However, in 1982, the United States Supreme Court ruled that retrial is barred under the federal constitution only where the misconduct is intended to provoke the defendant into moving for a mistrial. *Oregon v. Kennedy, supra.* The Pennsylvania Supreme Court adopted this standard in *Commonwealth v. Simons, supra,* holding that, because *Starks* rested on federal law, it was no longer viable in light of *Oregon v. Kennedy.* The court did note that "we can establish greater protection for our state citizens than provided by the United States Supreme Court." *Commonwealth v. Simons* at 16, 522 A.2d at 540.

Recognizing that the standard set forth in *Oregon v. Kennedy, supra,* was inadequate to protect a defendant's rights under the Pennsylvania Constitution, the Pennsylvania Supreme Court decided, in *Commonwealth v. Smith, supra,* that Pennsylvania's double jeopardy principles bar retrial where the prosecutor specifically undertakes to prejudice the defendant to the point of denying him a fair trial. In *Smith,* the Commonwealth concealed physical evidence which was highly exculpatory. Defense counsel did not learn of this evidence until before Smith's second trial.[1] The Court agreed with Smith's contention that the Commonwealth's misconduct barred his retrial because the prosecution intentionally deprived him of a fair trial. *Id.* Clearly, the misconduct in *Smith* was not intended to provoke the defendant into moving

---

1. Smith's first conviction was reversed because inadmissible evidence was admitted. *Commonwealth v. Smith,* 523 Pa. 577, 568 A.2d 600 (1989).

for a mistrial; rather, the Commonwealth intended that Smith would be convicted without ever discovering the exculpatory evidence.[2] Thus, the supreme court expanded the circumstances under which prosecutorial misconduct will bar retrial under the double jeopardy clause of the Pennsylvania Constitution.

This court has considered the applicability of the *Smith* holding in several cases. In *Commonwealth v. Moose*, 424 Pa.Super. 579, 623 A.2d 831 (1993), the prosecutor waited until the first day of trial to disclose a witness to whom the defendant allegedly made an incriminating statement. In *Commonwealth v. Rightley*, 421 Pa.Super. 270, 617 A.2d 1289 (1992), the prosecutor misrepresented that a witness had related inconsistent accounts of the incident and the prosecutor made improper statements during his closing argument. In *Commonwealth v. Santiago*, 439 Pa.Super. 447, 654 A.2d 1062 (1994), the prosecutor failed to disclose evidence.

In all of these cases, the issue presented was whether the principle set forth in *Smith* was applicable to bar retrial. This court interpreted *Smith* in these cases as "eviscerat[ing] the distinction that was formerly drawn under the *Oregon v. Kennedy* and *Commonwealth v. Simons* standards." *Commonwealth v. Rightley, supra,* at 277, 617 A.2d at 1292–93. In none of these cases was the question one of whether the misconduct was intended to goad the defendant into request-

**2.** Indeed, this is typical of the situation envisaged in the Dissenting Opinion by Del Sole, J. in *Commonwealth v. Simons*, 342 Pa.Super. 281, 492 A.2d 1119 (1985). If the prosecutorial misconduct gives rise to a mistrial, then the inquiry is whether the prosecution intended to goad the defendant into moving for a mistrial. If the trial court here had granted one of Appellants' numerous requests for a mistrial based on prosecutorial misconduct, that might well be the issue in this case. An accused's double jeopardy rights should not hinge on whether the trial court actually grants a mistrial because "a trial court when faced with a motion for mistrial, might be reluctant to grant same since it would give rise to a double jeopardy claim while a conviction and new trial would not." *Id.* at p. 306, 492 A.2d at p. 1132. Because we rely on the principles set forth in *Commonwealth v. Smith, supra,* however, we do not today decide whether prosecutorial misconduct which is intended to provoke a mistrial bars retrial where the trial court does not actually grant a mistrial.

ing a mistrial. Rather, the instances of misconduct in each of these cases were reviewed to determine whether the prosecutor intentionally deprived the defendant of a fair trial. Although the court did not, in the above cases, find that the prosecution intentionally deprived the defendant of a fair trial, we analyzed the misconduct under the *Smith* standard of whether the prosecution intended to deprive the defendant of a fair trial. We will likewise analyze the prosecutorial misconduct in the present cases under that standard.[3]

We need not look at every incident of prosecutorial misconduct alleged by Appellants; review of just a few of these incidents is sufficient to convince us that the prosecutor intended to deprive Appellants of a fair trial. Fully intending to convince the jury that Appellants were members of organized crime, had committed numerous other criminal acts and therefore should be convicted of this murder, the prosecutor started her misconduct before the first witness took the stand. During *voir dire* of the first jury panel, the prosecutor included three deceased persons as prospective witnesses. One of these, Angelo Bruno, was a notorious organized crime figure. Bruno had been dead for several years so he obviously could not be called as a witness in this case. The trial judge had to

---

**3.** The Commonwealth argues that our supreme court has already determined that *Commonwealth v. Smith, supra,* does not apply to this case and that decision is the law of the case. In support of this argument the Commonwealth relies on *Commonwealth v. Martorano,* 535 Pa. 178, 634 A.2d 1063 (1993), in which the Commonwealth appealed the grant of bail to Appellants. The supreme court noted that *"Smith* does not address the issue which is now before this court [which is] whether jury deadlock [on the penalty phase of a capital case] precludes imposition of the death penalty upon retrial." *Commonwealth v. Martorano, supra,* at p. 195, 634 A.2d at p. 1071. The law of the case doctrine precludes relitigating the same issue. The issue presently raised was not previously raised and would not have properly been raised on an appeal from a determination of bail. Rather, the double jeopardy issue becomes ripe for review when the Commonwealth decides to undertake reprosecution and is properly raised by a motion to dismiss filed prior to retrial, as was done here. *Commonwealth v. Moose,* 424 Pa.Super. 579, 623 A.2d 831 (1993), allocatur denied, 538 Pa. 613, 645 A.2d 1317 (1994) *cert. denied,* —— U.S. ——, 115 S.Ct. 672, 130 L.Ed.2d 605 (1994). Because the issue presently raised was not decided by or even before the supreme court in the prior appeal, the law of the case

dismiss the entire jury panel and admonished all counsel that there was to be absolutely no reference to organized crime figures or organized crime activity. N.T. 4/5/84 at pp. 37–58.

Unfortunately, this admonition fell on deaf ears. Throughout the trial, the prosecutor constantly attempted to portray Appellants as members of organized crime who had committed numerous other criminal acts.

During direct examination of Moran, for example, the prosecutor persisted in a line of questioning designed to elicit testimony that Moran and Appellant Daidone were involved in the drug business together. N.T. 5/21/84 at pp. 59–61, 79. The trial court sustained objections to these questions and admonished the prosecutor but she continued to try to elicit testimony about a drug business even though it was irrelevant to the issues in the trial.

Shortly thereafter, despite the trial court's continued warnings to the prosecutor not to bring in references to organized crime, the prosecutor elicited testimony from Moran which included the name "Nicky Scarfo" (another allegedly notorious organized crime figure). N.T. 5/21/84 at p. 98. Again, the trial judge sustained the objection and again admonished the prosecutor.

Nevertheless, during redirect examination of Moran, the prosecutor asked who, other than Moran and Appellant Martorano, was present at the grand opening of a restaurant. The prosecutor asked the question three different times and each time Appellants' objection was sustained. N.T. 6/11/84 at pp. 86, 88. Shortly thereafter, the prosecutor asked another question which was obviously designed to elicit irrelevant testimony which would imply that Appellants were part of an organized crime group. N.T. 6/11/84 at p. 91. At this time, an in-chambers conference occurred during which the trial judge continuously admonished the prosecutor about disregarding his previous rulings. At one point, the trial judge stated that he believed the prosecutor intended to ask for irrelevant and prejudicial testimony before an objection could

doctrine does not apply and the Commonwealth's argument is incorrect.

be stated [4] and thus imply to the jury that Appellants were organized crime figures who had committed other crimes. Such a tactic was clearly in defiance of the court's rulings that such evidence was irrelevant in this trial.

The prosecutor carried this tactic through trial and into her closing argument where she again injected the names of notorious organized crime figures even though the court, on the prosecutor's own motion, had forbidden counsel to mention these names in closing.[5]   N.T. 7/30/84 at p. 285.

Other instances of prosecutorial misconduct abound.   The prosecutor sought to introduce inadmissible hearsay, N.T. 5/29/84 at p. 191 (conversation between Moran and Attorneys Daidone and Tinari), and irrelevant evidence, e.g., conduct which occurred outside the time period of the alleged conspiracy, N.T. 5/29/84 at p. 30 (checking cars for bugs six months after the killing).   She denigrated the trial court's rulings in front of the jury to such an extent that the trial court held her in contempt.   N.T. 5/29/84 at p. 168 (stated "I don't believe this" after trial court sustained objection to irrelevant evidence).

The above is not an exhaustive recitation of all the incidents of prosecutorial misconduct which tended to deprive Appellants of a fair trial.   These incidents, and one other, are, however, perhaps the most blatant examples of misconduct during this trial.

Perhaps the most glaring demonstration of the prosecutor's desire to obtain a conviction at any cost revolves around the fingerprint evidence.   The Commonwealth presented Roy Land, a Philadelphia police technician, who testified that he lifted one identifiable fingerprint from the van which was allegedly involved in the killing.   On cross-examination, Land

4.   THE COURT: But I gather, Miss Christie, that you are saying point-blank—and I'm telling you this very frankly—that the reason you don't want to formulate your questions at this point is because you intend asking questions about [the killing of] Steve Bouras, for example, before there can be an objection.   N.T. 6/11/84 at p. 53.

5.   Appellee incorrectly states that Appellants did not object or move for a mistrial on this basis.   Appellee's Brief at p. 28.   The record shows that defense counsel did both.   N.T. 7/30/84 at p. 285.

558

testified that the FBI report indicated that the fingerprint did not belong to either Appellant. On redirect, the prosecutor implied to the jury that the fingerprint matched one of the Appellants but did not bear enough points of comparison to make a positive identification. Again, the prosecutor persisted in this line of questioning despite the trial court's sustaining Appellants' objections. Finally, exasperated with the prosecutor's behavior in ignoring the court's rulings, the trial judge reminded counsel that the testimony indicated that no fingerprints taken from the van related to anyone connected with this case. The prosecutor responded that that statement was "not exactly" correct. Because the prosecutor thus implied to the jury that the Commonwealth did indeed have fingerprint evidence linking Appellants to the van, the court immediately recessed to chambers to discuss this matter. The prosecutor advised the court that another technician, Joseph Grimes, found five points of comparison which would match Appellant Daidone's fingerprint. She repeatedly insisted that such evidence existed and that Technician Grimes had orally reported it to her. Significantly, no such report was ever turned over to defense counsel, even though the discovery order included oral and written reports. Ultimately, the court ordered the prosecutor to have Grimes in court the next day for questioning. Grimes testified that he made no reports on the fingerprint because there was nothing to report. He did not specifically recall discussing it with the prosecutor. However, he said that he would not and did not tell anyone that he had four or five points of comparison matching Appellant Daidone's fingerprint and therefore the print found in the van might have belonged to Appellant Daidone.[6] N.T. 5/15/84 at pp. 195, *et seq.;* N.T. 5/16/84 at pp. 28, 90–132; N.T. 5/17/84 at pp. 3–6,22–23.

6. Our ultimate conclusion is reinforced by the fact that the Commonwealth continues to insist that there was nothing wrong with the prosecutor's conduct in this instance because Grimes "had advised [the prosecutor] that four or five points of comparison *matched Daidone's fingerprint.*" Appellee's Brief at p. 21. Grimes unequivocal testimony was, of course, totally contrary to this assertion.

This incident, particularly when read in its entirety and in context with the prosecutor's conduct throughout the trial, makes it clear that the prosecutor planned to win a conviction through any means possible—if she had no evidence she would use innuendo and when that failed she would use outright lies.

The *Smith* standard precludes retrial where the prosecutor's conduct evidences an intent to so prejudice the defendant as to deny a fair trial. A fair trial is, of course, not a perfect trial. Errors can and do occur. That is why our judicial system provides for appeal to another court which can rectify such errors. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied. Certainly, a fair trial cannot be had when the jury is exposed to the type of innuendo, unfair comments, and half-truths which were apparent at this trial.

The Commonwealth nevertheless contends that the present case is distinguishable from *Smith* because *Smith* involved the Commonwealth's failure to divulge evidence of innocence. We find it equally abhorrent for the prosecutor to make it appear that there is evidence of guilt which in fact does not exist. That is a large part of what occurred here. The prosecutor made side comments within the hearing of the jury, denigrated the trial judge's rulings in open court, and constantly repeated questions to which objections had been sustained in order to make it appear that the trial court was not allowing the Commonwealth to present its entire case. We recognize that the prosecutor has a difficult road ahead when the case is based almost entirely on the testimony of a convicted murderer. However, a conviction should not be viewed as another notch on the prosecutor's belt. The prosecutor, as a representative of the Commonwealth, is obliged to present the truth and to uphold our Constitution, even if that means foregoing a conviction. As noted in President Judge McEwen's concurring statement in the previous appeal, "a fair trial is not simply a lofty goal, it is a constitutional mandate." *Commonwealth v. Martorano, supra.* Where that constitutional mandate is ignored and subverted by the Commonwealth, we

cannot simply turn a blind eye and give the Commonwealth another opportunity. The only just result is the one we now reach. We find that double jeopardy principles preclude retrial.

Order reversed. Appellants discharged.

CERCONE, President Judge Emeritus, files a concurring opinion.

CERCONE, President Judge Emeritus, concurring.

Although I agree with the sound result reached by the majority, I write separately to emphasize that the historical development of the standard articulated by the majority undermines the Commonwealth's contention that *Smith* only bars retrial following intentional prosecutorial misconduct designed to secure a conviction through the concealment of exculpatory evidence.

Traditionally, reviewing courts asked to determine whether prosecutorial misconduct prohibits re-trial on double jeopardy grounds have focused on the distinction between prosecutorial error and prosecutorial overreaching. Conduct that constituted mere prosecutorial error did not implicate double jeopardy principles; conduct that constituted prosecutorial overreaching, by contrast, triggered double jeopardy protections and barred retrial. *See United States v. Dinitz,* 424 U.S. 600, 609, 611, 96 S.Ct. 1075, 1080, 1082, 47 L.Ed.2d 267 (1976); *Commonwealth v. Simons,* 514 Pa. 10, 13, 522 A.2d 537, 539 (1987) ("Administrative error by a prosecutor is one thing; prosecutorial overreaching which triggers double jeopardy is another"). This distinction between prosecutorial error and prosecutorial overreaching was premised on the role of the prosecutor as the sovereign's representative:

In contrast to prosecutorial error, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect

against.... "[P]rosecutors are to seek justice, not only convictions."

*Commonwealth v. Starks*, 490 Pa. 336, 341, 416 A.2d 498, 500 (1980) (quoting *Commonwealth v. Cherry*, 474 Pa. 295, 301, 378 A.2d 800, 803 (1977)).

In *Commonwealth v. Starks*, our Supreme Court identified two types of prosecutorial overreaching: (1) prosecutorial misconduct designed to provoke a mistrial to secure a second, perhaps more favorable, opportunity to convict the defendant and (2) prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. *Id.* at 341, 416 A.2d at 500. The United States Supreme Court later restricted prosecutorial overreaching sufficient to bar re-trial to those cases in which the prosecutor intended to provoke the defendant into moving for a mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 679, 102 S.Ct. 2083, 2091, 72 L.Ed.2d 416 (1982). In 1987, our Supreme Court considered the implications of *Oregon v. Kennedy*. *Commonwealth v. Simons, supra*, 514 Pa. 10, 522 A.2d 537. Although the *Simons* Court noted that it was free to provide greater protections under Pennsylvania's Constitution, it nevertheless adopted the high court's conclusion that double jeopardy will bar retrial only when a mistrial has been intentionally provoked by the prosecutor. *Simons*, 514 Pa. at 16, 522 A.2d at 540. Five years later, in *Commonwealth v. Smith*, our Supreme Court acknowledged the more restrictive federal standard but held that "the double jeopardy clause under the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Commonwealth v. Smith*, 532 Pa. 177, 186, 615 A.2d 321, 325 (1992). Thus, *Smith* signaled a return to the pre-*Oregon* standard, with particular emphasis being accorded to the fairness of trial. Although *Smith* involved a prosecutor's intentional concealment of exculpatory material, our Supreme Court did not expressly restrict its rule to such a factual setting. Rather, the Court merely identified the concealment

of exculpatory evidence as an example of prosecutorial misconduct specifically undertaken to prejudice a defendant to the point of the denial of a fair trial.

Since *Smith* was decided, our courts have not had another occasion to bar retrial on the basis of prosecutorial misconduct intentionally undertaken to deprive a defendant of a fair trial. *See, e.g., Commonwealth v. Moose,* 424 Pa.Super. 579, 623 A.2d 831 (1993), *appeal denied,* 538 Pa. 613, 645 A.2d 1317 (1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 672, 130 L.Ed.2d 605 (1994) (superior court did not bar retrial despite the prosecutor's discovery violation; specifically, the Commonwealth failed to disclose the statement of its main witness until the first day of trial and its plea agreement with that witness until after securing a conviction); *Commonwealth v. Rightley,* 421 Pa.Super. 270, 279, 617 A.2d 1289, 1294 (1992) (a panel of this court rejected the defendant's claim that double jeopardy barred retrial; the trial court had granted the defendant a new trial because the prosecutor implied that a witness gave inconsistent testimony and because the prosecutor made three improper statements during his closing argument). Nevertheless, we continue to evaluate prosecutorial misconduct under the standard articulated in *Smith.* To that end, we reject prosecutorial misconduct designed to demean or subvert the truth seeking process:

> The role of the trial judge is to evaluate when the prosecutor has overstepped the bounds of zealous advocacy into an area which deprives the defendant of a fair trial. Unless the conduct, while perhaps reprehensible, is actually designed to demean or subvert the truth seeking process, *Smith* will not apply to bar a retrial.

*Rightley,* 421 Pa.Super. at 280, 617 A.2d at 1294.

I agree with the majority that this case presents an illustration of prosecutorial overreaching designed to demean or subvert the truth seeking process. I further agree that the voluminous record of this case obviates any attempt on our part to itemize each instance of the prosecutor's odious behavior. Nevertheless, I feel compelled to emphasize the atmosphere pervading the courtroom to provide guidance to the

bench and bar. To that end, I stress the prosecutor's perversion of the fingerprint evidence by quoting at length from the notes of testimony as previously summarized by a panel of this court:

The following exchange involving the prosecutor (Ms. Christie), appellant Martorano's counsel (Mr. Fitzpatrick), the witness, and the court took place during cross-examination by Mr. Fitzpatrick:

Q: And as a result of your search, you found one fingerprint?

A: Yes sir.

Q: Do you know whether that fingerprint was ever compared?

A: I believe it was, sir.

Q: And do you know whose fingerprint it was?

MS. CHRISTIE: Objected to, Your Honor. This witness would be testifying to hearsay, Your Honor, in that he would be testifying to an examination performed by another witness, sir.

. . . .

THE COURT: I'm going to overrule the objection.

Q (by Mr. Fitzpatrick): Whose fingerprint was it?

A: I do not know, sir.

Q: Nobody ever told you?

A: No, sir.

Q: Okay. But there was one fingerprint that was compared, and you think it was identified as belonging to a living individual; is that right? You just don't know the identity of that living individual? Right?

A: Living or deceased, that's correct.

N.T., 5/15/84, at 234–35. During cross-examination by Mr. Brown, counsel for appellant Daidone, Officer Land indicated that he knew the results of the fingerprint comparison:

Q: What was the result?

A: It was negative to your client and several other people that were listed.

Q: Was it positive as to anybody?

A: No, sir.

Q: So not just my client ... but it didn't identify anybody. Right?

A: That's correct, sir.

N.T., 5/16/84, at 28. During redirect examination this point was clarified by the court:

THE COURT: In other words, Officer Land, there is no human being alive today that those prints were related to in any way. Is that right?

A: That's correct, sir.

N.T., 5/16/84, at 91. The redirect examination then continued:

Q [by Ms. Christie]: Officer Land, with regard to the one identifiable lift, you have indicated, in answer to defense questions on cross-examination, that certain individuals connected to this case—that their fingerprints were compared as against that one lift. Is that correct?

MR. BROWN: I object, Your Honor.

THE COURT: I'll sustain the objection. The witness testified that these prints were not able to be hooked up to anybody.

. . . .

Q: I believe you were asked on cross-examination whether the FBI hooked up that one identifiable lift to any individual connected with this case. Is that correct, Officer Land?

MR. BROWN: I object. That's not so, sir.

THE COURT: I don't understand why you are questioning this, Miss Christie. The witness said that he cannot give you the name of anybody to whom any of the prints taken from that van relates. Isn't that what you testified to, Officer Land?

A: Yes, sir.

THE COURT: All right. That's it.

Q (by Ms. Christie): And was that answer to counsel on cross-examination based upon your knowledge of the FBI conclusion concerning that particular print?

A: Yes, ma'am.

. . . .

THE COURT: So the answer is that these prints . . . could not be hooked up to anybody in this case?

A: Correct, sir.

THE COURT: That's it.

. . . .

Q: Officer Land, on that one identifiable print, were there any points of comparison to any individual connected with this case?

MR. BROWN: I object.

THE COURT: I'll sustain the objection. The officer has testified that to the very best of his knowledge they were not able to relate any of these prints to anybody connected with this case or anybody period. And that's it. I am sustaining the objection.

MS. CHRISTIE: Very well. I don't wish to argue with your Honor.

. . . .

Q (by Ms. Christie): Does that one identifiable print bear any—contain any points of comparison?

MR. BROWN: I object sir.

THE COURT: I'll sustain the objection.

MR. BROWN: It was asked thirty-five times.

MS. CHRISTIE: I thought it was asked in terms of any connecting to this case.

MR. BROWN: Your Honor, I don't believe—

THE COURT: Hold it, hold it. We don't need any comments. I am sustain[ing] the objection to that question.

. . . .

Q  (by Ms. Christie): Do you know if that identifiable lift now contained on the card marked C–18–G was also submitted to Mr. Grimes [Officer Joseph Grimes, an evidence technician] to review?

A:  Yes, ma'am.

Q:  And what if any is your knowledge of Mr. Grimes' conclusion concerning that one lift?

MR. BROWN:  I object to that, your Honor.

THE COURT:  I'll sustain the objection to that question.

Q  (by Ms. Christie): Does that one identifiable lift bear eight or nine points of comparison to anyone connected in this case?

MR. BROWN:  I object, sir.

THE COURT:  I'll sustain the objection.

MR. BROWN:  Asked and answered, gone over and over.

THE COURT:  I'll sustain the objection.  **I think the testimony clearly reflects**—and if I'm wrong, tell me—any counsel—**that no fingerprints were taken from this van that relate to anybody connected with this case. Is that right?  Is that a safe statement to make?**

MR. BROWN:  Yes, sir.

MS. CHRISTIE:  **Not exactly, sir.**

MR. FITZPATRICK:  May we see your Honor at sidebar?

THE COURT:  Let me see counsel.

MR. BROWN:  Let's have it out right now.  He said there wasn't any hookup to anybody.

THE COURT:  I don't need further comment, Mr. Brown.

MS. CHRISTIE:  I asked about eight or nine points of comparison, your Honor—

THE COURT:  Miss Christie, I do not want anything further stated in front of the jury.  Let's have a conference on this.

N.T., 5/16/84, at 92–99.

During the ensuing conference in chambers, the prosecutor stated that "what I am prepared to show is that five

points of comparison as to that identifiable print compared to a known fingerprint of Albert Daidone" (N.T., 5/16/84, at 100). When Mr. Fitzpatrick maintained that "[w]e have not received a copy of a report from Mr. Grimes," the prosecutor replied, "You didn't, counsel, because it was oral . . . [b]ecause then it was submitted to the FBI, who then found, sir, 'We couldn't conclude it to be Daidone's print, because we require eight or nine points of comparison' " (N.T., 5/16/84, at 102). Mr. Fitzpatrick then moved for a mistrial, arguing that the prosecutor had failed to comply with the court's discovery order. The trial judge indicated that he would clarify the matter for the jury. The following discussion then took place:

> THE COURT: [T]he problem here, Miss Christie, is you have placed before the jury an implication that somebody in this case is tied into this van by a verifiable fingerprint. Now, from what I know up to this moment, there is no such testimony, there is no way . . . that anybody in this case can be tied up to that van. . . . What you are implying to the jury is that you have a fingerprint identification that indicates that somebody involved in this case was in that van. And you don't have it. You just don't have it.
>
> MS. CHRISTIE: I indicated to the jury that we don't have eight or nine points of comparison.
>
> MR. BROWN: Your Honor, this is the most rotten drivel I have ever heard.
>
> . . . .

N.T., 5/16/84, at 113–14.

. . . .

The following day Officer Grimes was interviewed outside of the jury's hearing. In response to the court's questioning, he indicated that he had no reports on the lifting of fingerprints from the van, he could not specifically recall talking to the prosecutor on that subject, and he neither looked over FBI reports concerning the prints nor knew anything about the conclusions drawn by the FBI. . . .

Q [by Mr. Fitzpatrick]: When they submitted this print to you, is there any reason why a report wasn't prepared on it?

A: The prints, to my knowledge, had little value. And I usually do not make a report on anything unless there's a conclusion to be obtained.

Q: I see. So that that print that they submitted to you ... you did not come to any opinion that the print belonged to an identifiable human being; is that correct, sir?

A: Well, it did belong to an identifiable human being. But I couldn't identify. That's what I am saying.

Q: You couldn't identify it by two or three or four or five points of comparison?.

A: That's correct.

Q: You didn't even find five points of comparisons; is that correct?

A: There might have been five, I don't know. But it was definitely insufficient.

N.T., 5/17/84, at 5–6. Mr. Brown, counsel for appellant Daidone, continued the questioning:

Q: Mr. Grimes, would you have ever said to somebody, ... "I have four or five points here which compare to Albert Daidone's print, so this indicates Daidone?" You couldn't possibly say that, could you?

A: **No. And I did not say that. Because you would have to say that about seven-hundred fifty thousand or a million people.**

. . . .

N.T., 5/17/84, at 22–23.

*Commonwealth v. Martorano*, 420 Pa.Super. 638, 610 A.2d 66 (1992) and *Commonwealth v. Daidone*, 420 Pa.Super. 635, 610 A.2d 63 (1992)(slip opinion at 6–16).

The prosecutor's persistent attempts to link appellant, through innuendo, to fingerprint evidence despite unequivocal expert testimony that the partial fingerprint could not be

identified as belonging to any living human being "were part of an overall scheme to give the jury the impression that the court was excluding evidence beneficial to the prosecution." *Id.* The prosecutor's use of innuendo in this instance and throughout the trial to pervert the truth-determining process undeniably "signal[ed] the breakdown of the integrity of the judicial proceeding, and represent[ed] the type of prosecutorial tactic which the double jeopardy clause was designed to protect against." *Starks, supra.* Accordingly, I agree that the order should be reversed and the appellants discharged.