COMMONWEALTH of Pennsylvania, Appellee

v.

William BASEMORE, Appellant.

Superior Court of Pennsylvania.

Submitted Oct. 25, 2004.

Filed May 20, 2005.

---

**11.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Todd E. Henry, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before: JOYCE, STEVENS, and ORIE MELVIN, JJ.

OPINION BY STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County after a jury convicted Appellant of murder in the first degree,[1] robbery,[2] burglary,[3] and possessing an instrument of crime.[4] We affirm.

¶ 2 On December 23, 1986, Appellant murdered a security guard while robbing the premises of his former employer. Following extensive pre-trial proceedings, trial commenced in April 1988. On May 3, 1988, Appellant was found guilty of all charges and sentenced to death. On November 16, 1990, the Pennsylvania Supreme Court affirmed the judgment of sentence. *Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861 (1990). The United States Supreme Court denied certiorari on February 24, 1992. *Basemore v. Pennsylvania*, 502 U.S. 1102, 112 S.Ct. 1191, 117 L.Ed.2d 432 (1992).

¶ 3 On January 20, 1995, Appellant filed a *pro se* petition for collateral relief brought under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541–9546. The PCRA court appointed counsel for petitioner, and, between December 1996 and April 1997, the PCRA court conducted a series of hearings on the petition.

¶ 4 In April 1997, the Philadelphia District Attorney's Office released a videotape of a training session, which had taken place within one year of Appellant's trial. The training session was conducted by former Assistant District Attorney Jack McMahon, the ADA who had prosecuted Appellant. The videotape showed that, during *voir dire*, Mr. McMahon arguably based his peremptory challenge on various race and gender-based stereotypes.

¶ 5 Following the release of the so-called "McMahon Tape," Appellant sought to supplement his PCRA petition to add a claim of discrimination in the jury selection process based upon the United States Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The PCRA court granted leave to file the supplemental petition but was unwilling to allow for the presentation of evidence with respect to the *Batson* claim, and, accordingly, dismissed the petition on October 8, 1997. Appellant filed a timely appeal, and, on January 20, 2000, the Pennsylvania Supreme Court reversed and remanded the matter for an evidentiary hearing on Appellant's *Batson* claim. *Commonwealth v. Basemore*, 560 Pa. 258, 264, 744 A.2d 717, 721 (2000).

¶ 6 An evidentiary hearing, at which Mr. McMahon testified, took place on February 5, 2001. It was established at the hearing that Mr. McMahon used nineteen peremptory challenges; all of the challenged jurors were African–American.

1. 18 Pa.C.S. § 2502(a).

2. 18 Pa.C.S.A. § 3701.

3. 18 Pa.C.S.A. § 3502.

4. 18 Pa.C.S.A. § 907.

N.T. 2/5/01 at 59–60. Appellant used eighteen peremptory challenges; all of the challenged jurors were Caucasian. N.T. 2/5/01 at 34–35. Mr. McMahon testified with respect to the statements on the videotape and as to his reasons for challenging eighteen of the nineteen jurors. N.T. 2/5/01 at 52–242. He was unable to determine a reason for his challenge to one juror. *Id.* At the hearing, the parties agreed that eight of the twelve jurors were Caucasian, three were African–American, and one was either Caucasian or Puerto Rican. *Id.* at 35, 68–69, 143–44. Oral argument on the *Batson* issue took place on July 2, 2001.[5]

¶ 7 On December 19, 2001, the PCRA court issued an opinion finding that the prosecution had violated *Batson*. The PCRA court found that the final composition of the jury was ten Caucasians, one African–American man, and one African–American woman.[6] PCRA Court Opinion 12/19/01 at 3. The PCRA Court stated:

> this Court is convinced that the trial prosecutor in this case engaged in a pattern of discrimination during voir dire. The record indicates a conscious strategy to exclude African–American jurors. This Court has carefully reviewed the trial prosecutor's explanations of his use of peremptory challenges and finds them insufficient. While some of the trial prosecutor's explanations could arguably be called "race-neutral", (sic) other explanations were insufficient and some of the peremptory challenges were unexplained.

PCRA Court Opinion 12/19/01 at 5. The PCRA Court granted the PCRA and ordered a new trial.

¶ 8 On March 15, 2002, Appellant filed a motion seeking to dismiss the charges against him on double jeopardy grounds; the motion was denied on July 22, 2002. Appellant's retrial commenced on March 26, 2003. On April 9, 2003, the jury found Appellant guilty of murder in the first degree and related charges; the jury deadlocked with respect to the imposition of the death penalty. On August 10, 2003, Appellant was sentenced to life in prison. The instant, timely appeal followed. Appellant was not directed to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P.1925(b), and thus, did not file a 1925(b) statement. The trial court has not issued an opinion.

¶ 9 On appeal, Appellant claims that the trial court erred by denying his motion to bar reprosecution on double jeopardy grounds, as the prosecutor's *Batson* violation during the first trial "manifested a conscious pattern of discrimination and denied Appellant equal protection of the law, thereby fatally prejudicing the proceedings[.]" Appellant's Brief at 3. For the reasons discussed below, we disagree.

¶ 10 The United States Supreme Court decided *Batson* in 1986. *Batson, supra.* In so doing, the United States Supreme Court reaffirmed a series of prior decisions, dating back to 1880, which held that the Equal Protection Clause of the United

---

5. We note that, during oral argument, the PCRA court repeatedly stated that the final composition of the jury was eight African–Americans and four Caucasians. N.T. 7/2/01 at 10 and 21. While neither party objected to this statement, our review of the record demonstrates that this was a misstatement by the PCRA Court, and we note with disapproval the use of such incorrect numbers by Appellee in its brief.

6. The changing numbers regarding the final jury composition show how difficult reconstruction becomes in this type of case. Our own independent review of the record found that the final composition of the jury was five Caucasian men, three Caucasian women, one African–American man, and three men whose race was unknown. One of the alternate jurors was a Caucasian woman and the other was an African–American woman.

States Constitution is violated when a defendant is tried before a jury from which members of his or her race are purposefully excluded. *Id.* (citing *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1879)). The *Batson* case concerned the evidentiary obstacles faced by defendants attempting to establish racial discrimination in the use of peremptory strikes. *Id.* In resolving *Batson,* the United States Supreme Court rejected the "crippling burden of proof" imposed by the Court's previous decision in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). *Batson,* 476 U.S. at 92, 106 S.Ct. at 1712 (citing cases). The *Batson* Court formulated the now familiar three-step burden-shifting framework to be used for the evidentiary inquiry into whether a challenge is race-based. *Id.* at 96–98, 106 S.Ct. at 1712. The *Batson* Court then remanded the matter for further evidentiary proceedings. *Id.* at 100, 106 S.Ct. at 1725.

¶ 11 Since the *Batson* decision, hundreds of state and federal courts have applied *Batson,* and, when *Batson* violations have occurred after jeopardy attached, those courts have remanded cases for further evidentiary proceedings, reversed convictions, and remanded for new trials. No state or federal court in any published or unpublished decision has ever held that a prosecutor's *Batson* violation, no matter the circumstances, constitutes prosecutorial misconduct of such a degree as to implicate double jeopardy principles.[7]

¶ 12 Appellant argues that a *Batson* violation constitutes a deliberate attempt to deprive a criminal defendant of a fair trial thus implicating double jeopardy concerns under the Pennsylvania Supreme Court's decisions in *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321 (1992) and *Commonwealth v. Martorano,* 559 Pa. 533, 741 A.2d 1221 (1999). In addition, Appellant argues that Mr. McMahon's conduct was either

---

**7.** There are few cases which even discuss the interplay of *Batson* and double jeopardy. In *Black v. State of Texas,* 845 S.W.2d 368 (Tex. Ct.App.1992), the Court of Appeals of Texas, with little explanation, found that double jeopardy was not implicated after the trial court granted Appellant's request for a mistrial based upon *Batson,* noting that Appellant could have proceeded to trial with the previously impaneled jury. *Id.* at 369–70. In a brief, unpublished decision, the United States Court of Appeals for the Ninth Circuit, similarly held that double jeopardy was not implicated following the trial court's grant of Appellant's request for a mistrial on *Batson* grounds, because there was no evidence that the prosecutor intended to cause the mistrial. *United States v. Jimenez,* 111 Fed.Appx. 901 (9th Cir.2004). We note two other Ninth Circuit cases which are of interest. In *United States v. Sammaripa,* 55 F.3d 433 (9th Cir. 1995), following the impaneling and swearing of the jury, the *prosecution* made a successful motion for a mistrial based upon *Batson* violations. *Id.* at 435. The Ninth Circuit held that double jeopardy barred retrial because the *Batson* violation should have been appar-

ent to the prosecution during *voir dire* and thus did not create a manifest necessity to declare a mistrial. *Id.* In *United States v. Bishop,* 959 F.2d 820 (9th Cir.1992), a case that has many factual similarities to the instant matter, Appellant raised a *Batson* claim on appeal and also raised a sufficiency of the evidence claim with respect to one of the several charges he had been convicted of. *Id.* The Ninth Circuit found in Appellant's favor on the *Batson* claim and granted a retrial, but then proceeded to address the merits of the sufficiency claim. *Id.* at 828–29. In so doing, the Ninth Circuit distinguished between a sufficiency of the evidence claim, where the successful Appellant is entitled to both a reversal of his conviction and an entry of a judgment of acquittal, which would bar the government from retrying him, and his successful *Batson* claim which only entitled him to a reversal of the conviction. *Id.* The Ninth Circuit specifically noted that, even if Appellant was successful on his sufficiency of the evidence claim, double jeopardy would not prevent the government from retrying him on the remaining charges which had been reversed for the *Batson* violations. *Id.* at n. 10.

grossly negligent or reckless which, based upon the Supreme Court of New Mexico's decision in *State of New Mexico v. Breit*, 122 N.M. 655, 930 P.2d 792 (1996), and the Supreme Court of Hawaii's decision in *State of Hawaii v. Rogan*, 91 Hawai'i 405, 984 P.2d 1231 (1999), allegedly implicates double jeopardy concerns. However, we find Appellant's reliance on these four cases to be misplaced.

¶ 13 In *Smith*, the Pennsylvania Supreme Court held that the prosecutor's misconduct "had constitutional implications under the double jeopardy clause which prohibit retrial." *Smith*, 532 Pa. at 179, 615 A.2d at 321–22. The defendant in *Smith* had been accused of murder. *Id.* Following his direct appeal, the defendant discovered that the prosecutor had withheld information regarding a favorable sentencing recommendation given to the prosecution's chief witness and that the prosecution had knowingly withheld exculpatory physical evidence.[8] *Id.* at 181, 615 A.2d 321, 615 A.2d at 323. The *Smith* Court held that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial "when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Id.* at 186, 615 A.2d at 325.

¶ 14 In *Martorano*, the Pennsylvania Supreme Court amplified the *Smith* standard and held that double jeopardy barred retrial of the defendant where the prosecutor committed misconduct including, "blatantly disregarding the trial court's evidentiary rulings, disparaging the integrity of the trial court in the front of the jury, and repeatedly alluding to evidence that the prosecutor knew did not exist." *Martorano*, 559 Pa. at 534, 741 A.2d at 1222. The *Martorano* Court rejected the Commonwealth's argument that the *Smith* doctrine only applied to cases where the prosecution withheld exculpatory evidence and held that, where the prosecutor's action "evinces the prosecutor's intent to deprive Appellant of a fair trial; to ignore the bounds of legitimate advocacy; in short, to win a conviction by any means necessary[,]" double jeopardy protection applies.[9] *Id.* at 539, 741 A.2d at 1223.

¶ 15 In *Breit*, the Supreme Court of New Mexico, relying, in part, on *Smith*, held that double jeopardy barred retrial of the defendant where the prosecutor engaged in "pervasive, incessant, and outrageous" behavior, which included attempting to inflame the jury during opening arguments, being rude to both opposing counsel and the court in the hearing of the jury, disregarding the trial court's evidentiary rulings, making an inflammatory closing argument during which the prosecutor attacked the defendant's exercises of

---

8. In fact, at trial, the Commonwealth "excoriated" a Commonwealth witness who testified about the existence of the physical evidence in question. The Commonwealth implied that the witness had fabricated his testimony, presented the testimony of other witnesses which contradicted the testimony, and recommended that the witness be prosecuted for perjury. *Id.* at 182–83, 615 A.2d at 323–24.

9. We note that this Court has only applied the amplified *Smith–Martorano* standard in one instance. In *Commonwealth v. Chmiel*, 777 A.2d 459 (Pa.Super.2001), we held that the prosecutor had committed misconduct when: (1) while questioning witnesses and in his

closing, he insinuated that the defendant had sexually assaulted one of the victims even though the defendant was not charged with sexual assault; and (2) during his closing, he injected the proceeding with religious law and asserted his personal belief as to the credibility of a witness. *Id.* at 465 and 467. However, we held that this conduct did not implicate the double jeopardy clause, and thus did not bar defendant's retrial, because the prosecutor's actions did not undermine the integrity of the trial court and was not intentionally designed to deprive defendant of a fair trial. *Id.*

his right to remain silent and his right to counsel, and suggesting to the jury that opposing counsel had lied and collaborated with the defendant to fabricate a defense. *Breit,* 122 N.M. at 667–68, 930 P.2d at 804–05. The *Breit* Court held that double jeopardy bars retrial of a defendant when

> improper official conduct is so unfairly prejudicial to the defendant that it cannot be cured by means short of a mistrial or a motion for a new trial, and if the official knows that the conduct is improper and prejudicial, and if the official either intends to provoke a mistrial or acts in willful disregard of the resulting mistrial, retrial, or reversal.

*Breit,* 122 N.M. at 666, 930 P.2d at 803.

¶ 16 In *Rogan,* the Supreme Court of Hawaii, relying in part on *Smith* and *Breit,* held that double jeopardy barred retrial of the defendant where the prosecutor made an impermissible appeal to racial prejudice and attempted to inflame the jury during his closing argument. *Rogan, supra.* The *Rogan* Court held that

> reprosecution of a defendant after a mistrial or reversal on appeal as a result of prosecutorial misconduct is barred where the prosecutorial misconduct is so egregious that, from an objective standpoint, it clearly denied a defendant his or her right to a fair trial. [] In other words, we hold that reprosecution is barred where, in the face of egregious prosecutorial misconduct, it cannot be said beyond a reasonable doubt that the defendant received a fair trial.

*Rogan,* 91 Hawai'i at 423, 984 P.2d at 1249 (footnote omitted).

¶ 17 It is well-settled that a *Batson* violation constitutes intentional misconduct by a prosecutor and a violation of the defendant's constitutional rights. However, Appellant has provided no persuasive legal support for his claim that a *Batson* violation, which is not addressed until after jeopardy attaches, without more, constitutes the type of prosecutorial misconduct that *Smith, Martorano, Breit,* and *Rogan* were designed to remedy. All four of these cases were concerned with misrepresenting and/or withholding of evidence by the prosecution so as to obtain an unfair verdict. These cases discussed actions taken by the prosecutor which hampered the ability of the defendant to present a defense and mocked the integrity of the trial court, tactics that were "designed to demean or subvert the truth seeking process." *Chmiel,* 777 A.2d at 464 (internal citation omitted). Further, with the exception of *Rogan,*[10] all of the cases concerned a course of conduct by the prosecution, such as in *Smith,* where the prosecutor's concealment of evidence lasted throughout the trial and well into the appellate process, *Smith, supra,* while in both *Martorano* and *Breit* the misconduct affected every stage of the trial process, beginning in *voir dire* and continuing into the appellate proceedings, *Martorano, supra,* and *Breit, supra.* Further, in all of these cases, the prosecutor's misconduct was compounded because of the relatively weak cases against the defendants.[11] In

---

10. *Rogan* is the rare case where a single action by the prosecutor, an attempt to appeal to the racial prejudice of the jury in a sexual assault case involving a young, African–American man and an underage Caucasian girl, was found to be so egregious as to implicate double jeopardy concerns. *Rogan, supra.*

11. Much of the evidence in *Smith* was circumstantial and several of the key witnesses

were convicted felons. *See Commonwealth v. Smith,* 523 Pa. 577, 568 A.2d 600 (1989) and *Commonwealth v. Smith,* 404 Pa.Super. 553, 591 A.2d 730 (1991). The sole evidence against the defendants in *Martorano* consisted of the testimony of a convicted murderer. *See Commonwealth v. Martorano,* 453 Pa.Super. 550, 684 A.2d 179 (1996). In *Breit,* the defendant admitted killing the victim but argued

these cases, the combination of extreme prosecutorial misconduct coupled with weak evidence made it impossible for the jury to reach a fair verdict.

¶ 18 In the instant matter, Appellant does not argue that the prosecution in any way interfered with the truth-seeking process. Further, the evidence at trial was strong, consisting of the weapons and safe-cutting equipment left behind at the scene which had been traced to Appellant, items stolen in the robbery which were found at Appellant's residence, martial arts equipment similar to that found at the robbery which was recovered from Appellant's residence, and clothing stained with the victim's blood, also recovered from Appellant's residence, as well as a variety of incriminating statements made by Appellant. *Basemore,* 560 Pa. at 264, 744 A.2d at 720–21.

¶ 19 *Batson* violations are a peculiar type of prosecutorial misconduct. While we in no way wish to minimize the importance of the constitutional principles underlying the *Batson* decision or to disregard the severity of the prosecutor's misconduct in this matter, we believe that there are legitimate distinctions to be made between a prosecutor's misconduct in concealing exculpatory evidence or completely disrupting the trial process and a prosecutor's attempt to assemble a jury by relying on outworn and unacceptable stereotypes. In the cases cited above, the prosecutor's misconduct so permeated the presentation of evidence that it was not possible for a reasonable jury to reach a fair verdict; in the instant matter, it is only if we accept the very stereotypes espoused by the prosecution that we can conclude that the first jury was incapable of rendering a fair verdict. Thus, we are not persuaded by Appellant's argument that the prosecution's *Batson* violation necessitates the ultimate remedy of double jeopardy.

¶ 20 We. also find no support in the above cases cited by Appellant for the idea that either grossly negligent or reckless conduct by a prosecutor implicates double jeopardy concerns. Both *Smith* and *Martorano* specifically discuss intentional misconduct by the prosecutor. *Smith, supra; Martorano, supra.* While *Martorano* discusses prosecutorial "overreaching," there is no support for the notion that this term was intended to encompass negligent or reckless conduct by a prosecutor. *Martorano, supra.* Further, while Appellant specifically cites to *Breit* as support for his claim, we find this reliance to be misplaced. In *Breit,* the Supreme Court of New Mexico specifically stated that it had chosen the term "willful disregard" to distinguish the type of prosecutorial misconduct that implicated double jeopardy concerns from conduct that was either "reckless," "negligent", or in some other way "connote[d] a virtual lack of awareness." *Breit,* 122 N.M. at 666, 930 P.2d at 803. Lastly, we see nothing in *Rogan,* a case which concerned intentional "egregious" statements made by the prosecutor, to support a claim that negligent or reckless prosecutorial misconduct implicates double jeopardy concerns. *Rogan, supra.*

that he had acted in self-defense, the *Breit* Court described the police's investigation as "inept," the eyewitnesses as "reluctant," and the evidence of premeditation as inconclusive. *Breit, supra.* Lastly, the sole evidence against the defendant in *Rogan* was the testimony of the victim who admitted that she had, against her parents express commands, invited a stranger into her home when she was alone, proceeded to take him into her bedroom, willingly engaged in some of the testified to sexual contact with him, and was only testifying against him because of parental pressure. *Rogan, supra.*

¶ 21 In conclusion, nowhere in the approximately twenty years of *Batson* jurisprudence has there been any suggestion that a *Batson* violation so subverts the truth seeking process as to implicate double jeopardy concerns. We find nothing in Appellant's claims that would lead us believe that we should create such a remedy. Appellant successfully argued that the prosecutor violated his rights under *Batson*. He was awarded the proper remedy, a new trial untainted by any prosecutorial misconduct. Accordingly, we affirm the judgment of sentence.

¶ 22 Affirmed.

¶ 23 JOYCE, J. Files a Dissenting Opinion.

## DISSENTING OPINION BY JOYCE, J.:

¶ 1 I disagree with the Majority's finding that the double jeopardy clause of the Fifth Amendment of the United States Constitution and Article 1, Section 10 of the Pennsylvania Constitution does not bar Appellant's retrial when the prosecutor engaged in egregious prosecutorial misconduct. The Majority states that "Appellant has provided no persuasive legal support for his claim that a *Batson* violation, which is not addressed until after jeopardy attaches [12], without more, constitutes the type of prosecutorial misconduct that *Smith, Martorano, Breit* and *Rogan* were designed to remedy." Majority opinion, at 10. It is my opinion that because of the very nature of a *Batson* violation, that more need not be provided to establish egregious prosecutorial misconduct to warrant the application of the double jeopardy clause and bar retrial.

¶ 2 There is a dearth of case law that specifically discusses the interplay between the equal protection and double jeopardy clauses of the United States or Pennsylvania Constitutions. Indeed, most decisions involve a variance of alleged prosecutorial misconduct stemming from a discovery violation or some prosecutorial tactic taken during the course of the trial. These matters mostly constitute due process questions, the establishment of which will then spawn a double jeopardy issue. Nonetheless, the standard for ascertaining whether prosecutorial misconduct exists so to mandate the protections of the double jeopardy clause applies to the due process and equal protection clauses equally. *See Commonwealth v. Martorano*, 559 Pa. 533, 741 A.2d 1221, 1223 (1999) (*Smith's* [*infra*] holding is not limited to cases of concealment of evidence but allows for a number of scenarios of prosecutorial overreaching so to apply double jeopardy).

¶ 3 The substantive law as it pertains to *Batson* states that

although a prosecutor ordinarily is entitled to exercise peremptory challenges for any reason related to his or her view concerning the outcome of the case, the equal protection clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the state's case against the black defendant. [*Batson*] at 87, 106 S.Ct. at 1718, 90 L.Ed.2d at 81. Racial discrimination in selection of jurors, the court said, harms not only the accused and the potential jurors and but also the public's confidence in the fairness of our system of justice. *Id.*

---

12. I am doubtful that this statement is true. Often times, a defendant makes a *Batson* challenge prior to the completion of jury selection. *See, e.g, Black v. State of Texas*, 845 S.W.2d 368 (Tx Ct.App.1992).

*Commonwealth v. Rico*, 551 Pa. 526, 711 A.2d 990, 992 (1998). *Batson* violations impact upon the "fundamental fairness of a trial." *Basemore, supra*, 744 A.2d at 734. Racial discrimination in jury selection is more than trial error; it results in a structural defect, *Tankleff v. Senkowski*, 135 F.3d 235, 248 (2nd Cir.1998), affecting the framework within which the trial proceeds, depriving a defendant of the "basic protections" that a trial is designed to protect, and undermining the reliability of the verdict. *Basemore*, 744 A.2d at 734, referring to *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). Active discrimination by litigants on the basis of minority stereotypes during jury selection "invites cynicism respecting the jury's neutrality and its obligation to adhere to the law." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 1427, 128 L.Ed.2d 89 (1994) citing *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Where the Commonwealth successfully sought the imposition of the death penalty, the sentence of death is also rendered unreliable. *Basemore*, 744 A.2d at 734. I now turn to the issue of whether a prosecutor who abuses these principles commits the type of prosecutorial misconduct that would bar retrial.

¶ 4 In *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992), our Supreme Court set forth the test for determining when the double jeopardy clause prevents an accused from being subject to a second trial.[13] The Court stated:

> The double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial.

*Smith*, 615 A.2d at 325. "In order to raise double jeopardy implications, prosecutorial misconduct must be deliberate, undertaken in bad faith and with a specific intent to deny the defendant a fair trial." *Commonwealth v. Santiago*, 439 Pa.Super. 447, 654 A.2d 1062, 1085 (1994). Additionally, "[t]he double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant subjected to the kind of prosecutorial misconduct intended to subvert a defendant's constitutional rights." *Commonwealth v. Lambert*, 765 A.2d 306, 327 (Pa.Super.2000) citing *Smith, supra*. "In contrast to prosecutorial error, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against." *Martorano, supra*, 741 A.2d

---

**13.** Prior to Appellant's trial, Pennsylvania followed federal law in recognizing the two forms of prosecutorial misconduct (described here in *Smith*) which would compel double jeopardy protection. *See Commonwealth v. Starks*, 490 Pa. 336, 416 A.2d 498 (1980). However, when the United States Supreme Court decided *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), which held that double jeopardy barred retrial only when the prosecutor goaded the defendant into seeking a mistrial, Pennsylvania conformed its standard accordingly. *Commonwealth v. Simons*, 514 Pa. 10, 522 A.2d 537, 540 (1987). Several years later, in *Commonwealth v. Smith*, 532 Pa. 177, 615 A.2d 321 (1992), Pennsylvania reverted to the former standard enunciated in *Starks*.

The *Oregon/Simons* standard was the one in practice when Appellant was first tried. Nonetheless, it is the *Starks/Smith* standard that controls the disposition of this case since it is the current law. *See Simons, supra*, 522 A.2d at 541 (although Simon's trial occurred when *Starks* applied, *Oregon's* standard was the law at the time of appeal and was controlling).

at 1222 (citation omitted). In reviewing this claim, I am also mindful of the compelling societal interest in prosecuting criminal defendants to conclusion. To this end, our Supreme Court has recognized that "dismissal of charges is an extreme sanction that should be imposed sparingly and, relevant to the question here, only in cases of blatant prosecutorial misconduct." *Commonwealth v. Burke,* 566 Pa. 402, 781 A.2d 1136, 1144 (2001).

¶ 5 In this case, the prosecutorial misconduct which forms the basis of the double jeopardy claim was the prosecutor's exercise of preemptory challenges to exclude African–Americans from the jury. Upon review of the transcript of the "McMahon" videotapes, our Supreme Court described McMahon's teachings as follows:

> We have reviewed the transcript presented to determine the extent to which its contents, if established as accurate, would support such a [*Batson*] claim. In the document: the purpose of voir dire, namely, to select a fair and impartial jury, is denigrated as "ridiculous," in favor of the selection of jurors who will be biased in favor of conviction; various racial and gender stereotypes are described and offered as reasons to discriminate in the selection of jurors; techniques for accomplishing such discrimination are described in detail, including the maintenance of a running tally of the race of the venire panel and the invention of pretextual reasons for exercising peremptory challenges; and a willingness to deceive trial courts to manipulate jury panels to these ends is also expressed.

*Basemore, supra,* 744 A.2d at 729. The Supreme Court found that "[t]here can be no question that the practices described in the transcript support an inference of invidious discrimination on the part of any proponent" and that the "practices described in the transcript ... flout constitutional principles in a highly flagrant manner." *Id.* at 731 and fn. 12. However, since no evidence was presented on the *Batson* claim, the case was reversed and remanded in order for the PCRA court to conduct an evidentiary hearing. After receiving evidence and testimony on the *Batson* claim, the PCRA court found that "the jury selection procedure manifested a conscious pattern of discrimination and denied [Appellant] equal protection of the law, thus, fatally prejudicing the proceedings." PCRA court opinion, 12/19/01, at 2.

¶ 6 Presently, the record establishes that the prosecutor engaged in a systematic and discriminatory method of excluding potential jurors because of their race. His intentions were not to seek a fair and impartial jury, but one that was most likely to do what he wanted them to do, in essence, convict. His conduct evidenced his desire to deny Appellant his constitutional right to equal protection and to a fair trial.

¶ 7 The law pertaining to prosecutorial misconduct egregious enough to bar retrial requires that the prosecutor intentionally provoke a defendant into requesting a mistrial or "must be deliberate, undertaken in bad faith and with a specific intent to deny the defendant a fair trial." *Smith, supra.* When the underlying conduct in question involves a *Batson* claim of discrimination in violation of the equal protection clause, proof of such by its very definition would fall within the scope of prosecutorial misconduct so egregious that double jeopardy applies. This is so because the intentional conduct prohibited by *Batson* is designed to impugn on the fundamental fairness of the proceeding and specifically deny the defendant a fair trial. Indeed, such a constitutional violation permeates the proceedings so perva-

sively that it is not subject to a harmless error or prejudice analysis. *Basemore*, 744 A.2d at 734.[14] Selecting a jury in a discriminatory manner corrupts the very principle upon which criminal jurisprudence is based—that an accused is innocent until found guilty by a fair and impartial jury of his/her peers. Thus, by its very nature, any *Batson* violation will be so egregious, will flout constitutional principles so flagrantly, it neatly falls into the definition of prosecutorial misconduct and warrants the protection of the double jeopardy clause. Indeed, given that the underlying proofs establishing a *Batson* violation are coextensive with the standard for finding prosecutorial misconduct of the type to bar retrial, it is difficult to foresee a situation where the establishment of a *Batson* violation would not compel a finding of prosecutorial misconduct and an application of double jeopardy, should a defendant seek the remedy.

¶ 8 Having said that, I do not believe that such a black and white application of these principles ultimately serves justice. Such is true in the case at bar where the proof of Appellant's guilt is overwhelming, as is evidenced by the fact that he was again convicted upon retrial by a fair and impartial jury. Nonetheless, I conclude that I am bound by precedent, and, should Appellant exercise his judgment to petition for allowance of appeal to the Pennsylvania Supreme Court, I respectfully urge the Court to grant the petition and provide its guidance.[15]

¶ 9 Accordingly, I dissent.

---

14. Just as a harmless error or prejudice analysis is inappropriate, so is an analysis that is partly premised on the strength of the Commonwealth's case. *See* Majority opinion, at 355.

15. The Majority has noted several cases wherein the interplay between *Batson* and double jeopardy were "discussed." Majority opinion, at 353, n.7. Although there is only an intimation that these cases may be dispositive, I am compelled to comment as to why they are not.

In *Black v. State of Texas*, 845 S.W.2d 368 (Tex.Ct.App.1992), and *United States v. Jimenez*, 111 Fed.Appx. 901 (9th Cir.2004), the *Oregon* standard was controlling. Thus, unlike the case at bar, the only standard by which to judge the double jeopardy claim was whether the prosecutor committed a *Batson* violation in an effort to provoke the defendant into requesting a mistrial. Clearly, these two cases are distinguishable since here we also may consider whether the prosecutor's *Batson* violations were intentionally undertaken

to prejudice the defendant to the point of the denial of a fair trial. *Smith*, 615 A.2d at 325.

In *United States v. Sammaripa*, 55 F.3d 433 (9th Cir.1995), the defendant committed *Batson* violations and the prosecutor was granted a mistrial over defendant's objection. The court stated that "[a]fter jeopardy attaches, the court's declaration of a mistrial—over the defendant's objection—does not bar retrial where the mistrial was declared because of manifest necessity." *Id*. at 434. The court found that manifest necessity did not exist and barred retrial. Of course, this case is not applicable instantly since the issue was not prosecutorial misconduct, but whether the standard for granting a mistrial was met.

The Majority also cites to *United States v. Bishop*, 959 F.2d 820 (9th Cir.1992). The *Bishop* Court found that the district court erred in denying defendant's *Batson* claim, and reversed the defendant's drug trafficking convictions. The defendant never raised or even argued that the double jeopardy clause prohibited retrial. Since the issue was not before the court, the one sentence contained in a footnote regarding double jeopardy is merely *dicta*.